**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**WHITFIELD PICKLE COMPANY, Respondent.**

**No. 22949.**

United States Court of Appeals
Fifth Circuit.
March 24, 1967.

Rehearing Denied April 18, 1967.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Frank H. Itkin, Atty., N.L.R.B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Elliott Moore, Atty., N.L.R.B., for petitioner.

Fred S. Ball, Montgomery, Ala., for respondent.

Before TUTTLE, Chief Judge, and THORNBERRY and GOLDBERG, Circuit Judges.

GOLDBERG, Circuit Judge:

The National Labor Relations Board here petitions for enforcement of its order[1] directed against the Whitfield Pickle Company. The Board affirmed the trial examiner's findings of violations of § 8(a) (1), (3), and (4) of the Act.

The pickle company has a plant in Montgomery, Alabama which makes pickles and relish from cucumbers. This business is conducted in interstate commerce. The company employs about 250 people all year, and adds from 50 to 75 each year as temporary help for the period from about May 20 to June 20, when the new crop is packed.

Late in 1963 or early in 1964, the Retail, Wholesale and Department Store Union began an organization campaign at the plant. On January 20, 1964 the union sent a letter to L. B. Whitfield, Jr., the president of the company, advising him of the campaign and naming five employees as representatives. An election was held on March 20, at which the employees voted, 85 to 75, in favor of the union. The events complained of took place in the weeks surrounding the election.

We first consider the § 8(a) (1) questions, and then the § 8(a) (3) and (4) questions.

I.

The company does not argue the § 8 (a) (1) question in its brief, calling it "water over the dam" and "now of no practical consequence to either of the parties." This surrender is wholly understandable in the light of the record, which is heavy with overt acts of discouragement of the union by L. B. Whitfield, III, assistant vice president and son of the president.

Several days before the election, Nonnia Bell, one of the five employees named as a union representative in the union's January 20 letter, made a speech favoring the union to her fellow employees in the plant's lunchroom-dressing room during the lunch period. Whitfield, III entered the room during the speech, listened to it in silence, and exited. When Mrs. Bell left the room, she found Whitfield waiting; he told her that the law of private property prevented her from talking union while she was on the company grounds, even on free time.

Several weeks after the election, Mrs. Bell and two other employees approached Whitfield, III to ask him whether the rule banning union talk on company property was still in effect. Whitfield replied that it was, and in fact extended it to cover distribution of leaflets and other printed matter. The employees were told to get a lawyer if they did not like the rule, and Whitfield announced that the company would not sign any contract with the union. (The company has signed one since.)

These pronouncements by Whitfield had nothing to do with the normal industrial discipline or the orderly production of pickles. Their motivation was anti-union. This is an impermissible motivation.

"A no solicitation rule applicable to employees during their non-working time unlawfully interferes with their

I. Pursuant to § 10(e) of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq.

right to discuss self-organization among themselves, unless the employer proves special circumstances that make such a restriction necessary to maintain production or discipline. No contention is made in this case of the existence of any such special circumstances." N.L.R.B. v. Walton Mfg. Co., 5 Cir. 1961, 289 F.2d 177, 180.

N.L.R.B. v. Babcock & Wilcox Co., 1956, 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975; Republic Aviation Corp. v. N.L.R.B., 1945, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372; N.L.R.B. v. Mira-Pak, Inc., 5 Cir. 1965, 354 F.2d 525; N.L.R.B. v. Southwire Co., 5 Cir. 1965, 352 F.2d 346.

## II.

The close and contested issue is the firing and refusal to rehire of Marguerite Goodwin. The Board found a violation of § 8(a) (3) in the discharge of Mrs. Goodwin, and also found violations of § 8(a) (3) and (4) [2] in the refusal to rehire her.

We hold that the finding of discriminatory firing is not based on substantial evidence. We agree with the Board, however, that the company did violate § 8(a) (4) by failing to rehire Mrs. Goodwin because she had pressed an unfair labor practice charge after she was fired.

Mrs. Goodwin was first hired during 1958 as temporary help for the summer season. She was first a packer and then was promoted to grading pickles. She was hired permanently as a grader in 1961, and the evidence showed that she was more than competent and had never been criticized or called down by any superior. However, in August, 1963, Mrs. Goodwin fell ill and missed 13 days of work. She missed two more in September, one in November, and three in

December. Then, in early 1964, came the union campaign. Shortly after January 20, Mrs. Goodwin was approached at work by her supervisor, John Brown. Brown had no power to fire Mrs. Goodwin. He asked her whether she had been at a recent union meeting. She replied that she had, and that she was in favor of the union. Brown was one of a three-man committee which passed on applications for loans from the employees' credit union; Mrs. Goodwin had a loan outstanding with the credit union, and she then asked Brown if she could get her cosigner changed from an employee who opposed the union to Mrs. Bell, who supported it. Brown agreed to the change; but then he warned her that employees had been fired for striking in the past, and he advised her to leave the union alone.

Mrs. Goodwin by her own admission barely participated in the union campaign.[3] Her sole activity, other than attending meetings, was to pass out four union cards to fellow employees. She characterized herself as a "private in the rear ranks."

Mrs. Goodwin became ill at work on Thursday, February 13, and stayed out on Monday. She telephoned her supervisor but was connected with S. A. Ribbik, the plant superintendent. He advised her to get a doctor's certificate before returning to work.

On Thursday, February 20, J. C. Herring, the vice president, wrote Mrs. Goodwin a letter firing her because "you have entirely too much absenteeism." Mrs. Goodwin received the letter Friday and called Herring. Herring said she had been fired because she had called everyone except him to report her illness. (Mrs. Goodwin had never been asked to

---

**2.** In pertinent part, § 8(a) reads:
  (a) It shall be an unfair labor practice for an employer—
    \*    \*    \*    \*    \*
  (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization
    \*    \*    \*    \*    \*

  (4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter \* \* \*.

**3.** She was not one of the signers of the January 20 letter which the union sent to the company.

call Herring in such a case; she was supposed to call her supervisor, which she had done.) She also told Herring of her doctor's prognosis that she would be ill for some time. She then said that she would have to apply for unemployment insurance if she could not work. Herring replied that the company would contest her application because it was trying to minimize its unemployment insurance premiums. He was as good as his word: the company did protest, but unsuccessfully.

On Saturday, February 22, unable to obtain an answer when she called the plant, Mrs. Goodwin called President Whitfield at his home, explaining to him that she was trying to reach someone who would help her about her job because she had been fired. He advised her to call Frank Whitfield, another son, at the plant. Pursuant to a subsequent telephone call to Frank Whitfield, Mrs. Goodwin went to the plant on Monday, February 24. She gave her discharge letter to Whitfield, who advised her that his father had turned the matter over to him to straighten out. Mrs. Goodwin asked if she should go to work and was advised to go to the dressing room and wait until Whitfield had talked to Ribbik and Herring. Subsequently, about 10 a. m., she talked to Ribbik, who advised her that he did not understand why she was there, that the discharge letter should have been enough. When she inquired if she could go to work, she was told that she had already been replaced, that when the company needed 20 graders, it needed 20, not 19 or 21. She then requested the return of the doctor's certificate and the discharge letter, which she had given to Whitfield. She inquired of Ribbik whether after she went to the hospital they would let her return to work, and he said they would not. She then left.

In late February or early March, while Mrs. Goodwin was in the hospital, her supervisor, Fanny Sexton, advised her that she had asked both Herring and Frank Whitfield to put Mrs. Goodwin back to work. On February 27, the Union filed charges alleging that Mrs. Goodwin had been discriminatorily discharged. On about March 9, Mrs. Goodwin's doctor called the plant and said that she could return to work. Mrs. Goodwin then called J. G. Alred, the company's secretary-treasurer. Alred advised her that she could not be rehired, that something had come up since she had left the plant. When she asked if the Union had anything to do with it, he replied, "[Y]es they do, those things do have a way of making things unpleasant you know, and I am sorry, there is nothing I can do for you at this time." Alred testified, "After having received this notice from the Government that we were being charged with unfair labor practices because we had discharged Elizabeth when in fact we had no knowledge that Elizabeth had anything whatsoever to do with the union, then after consulting with other officials of the company we decided that under those circumstances we did not think it right to take her back."

The Board adopted the trial examiner's finding that Mrs. Goodwin's discharge violated § 8(a) (3). The General Counsel's burden was to show that the company in firing Mrs. Goodwin discriminated against her because of union activity. Showing that the company had callous disregard for her is not enough. Judge Wisdom has stated the principle with arresting clarity:

"Discrimination consists in treating like cases differently. If an employer fires a union sympathizer or organizer, a finding of discrimination rests on the assumption that in the absence of the union activities he would have treated the employee differently." Frosty Morn Meats, Inc. v. N. L. R. B., 5 Cir. 1961, 296 F.2d 617, 621.

To show the discriminatory motive the Board points to two factors: first, that the company knew of Mrs. Goodwin's union activities when it fired her, and second, that the company's explanation that it fired her for absenteeism does not hold water because the other employees fired for that reason had been

absent for much greater periods before being fired. Neither of the Board's arguments will stand.

To demonstrate knowledge and motive, the Board relies on the conversation between Mrs. Goodwin and the supervisor, Brown. But this was, when read as a whole, a comparatively innocuous conversation between an employee minimally active in the union, and a low-ranking supervisor with no power to fire her. Most of the conversation dealt with getting a replacement for the co-signor on Mrs. Goodwin's loan from the credit union.

In fact, since Brown did not participate in the decision to fire Mrs. Goodwin, the crucial question is whether those who did fire her knew at all of her union connection. Ribbik, Herring, and Alred all swore that they did not know of it. The trial examiner and the Board brush these denials aside, but point to no direct evidence showing knowledge at a higher echelon than Brown. The company may be chargeable with Brown's actions as a supervisor (e. g., for purposes of § 8 (a) (1)), but it does not follow that the company's officers are chargeable with his knowledge for the purposes of § 8 (a) (3) where the question is their actual motive in discharging an employee. Cf. N. L. R. B. v. Chronicle Publishing Co., 7 Cir. 1956, 230 F.2d 543.

■ The trial examiner and the Board find it "incredible" that the company officers did not know of Mrs. Goodwin's union activities, but the barrenness of the record on this point indicates that their incredulity springs from nothing more than the assumption or suspicion that the officers' denials are false. The officers gave sworn testimony in an attempt to prove a negative: it can be well-nigh impossible to prove that one did not know something in the past by any other means than sworn denials. Such sworn testimony cannot be "arbitrarily disregarded" because of the merest suspicion or assumption, without more, that the denials are lies. N. L. R. B. v. Atlanta Coca-Cola Bottling Co., 5 Cir. 1961, 293 F.2d 300, 306; Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

Ranged against this weak theory of discriminatory discharge is a good deal of evidence supporting the company's defense that it fired Mrs. Goodwin because she was often absent from her job. She had missed a total of some 23 working days in the less than six months preceding her discharge. The trial examiner relied on the fact that another employee was not fired for a much more extensive record of absenteeism (a year and a half and then another period of six months), asserting that this showed a "disparity of treatment." But the record here shows that Mrs. Goodwin was the fifth employee to receive a letter of outright discharge for absenteeism (with no grace period in which to report) within the six months preceding her discharge. Of the other four, only one letter shows a definite number of days missed. Employee Post was fired for being absent seven days over the period running from November 6 to December 20, 1963. Other letters simply say "repeatedly absent from work" or "absent so much of the time." The treatment of these employees does not show any disparity sufficient to raise the inference that Mrs. Goodwin was discharged for something other than absenteeism.[4]

■ Under Universal Camera Corp. v. N. L. R. B., supra, we may overturn a Board finding only where it is not supported by substantial evidence on the record as a whole. Respect for such findings we must have. N. L. R. B. v.

---

4. The trial examiner found, "It is thus evident that except in the case of Randall, each employee [among the group discharged for absenteeism during the ten months preceding Mrs. Goodwin's discharge] had been absent substantially more than [the] 4 days of absence in Goodwin's case." The Board in its brief here also takes the narrow view that the only period of absence relevant to Mrs. Goodwin's discharge was the four days immediately preceding it. This view is a distortion; even under the new math, 23 is "substantially more" than 4.

Walton Mfg. Co., 1962, 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829, instructs us fully as to these forays, and Oil City Brass Works v. N. L. R. B., 5 Cir. 1966, 357 F.2d 466, elucidates further our obligation to limit our review to an examination of the inherent strength or weakness of the Board's inferences and deductions. Forbidden territory for this Court is credibility and testimonial construction. But even in this narrow aperture of review we need not slavishly follow the Board. Where an employer fires a union sympathizer, the General Counsel must show by substantial evidence that "in the absence of the union activities he would have treated the employee differently." Frosty Morn Meats, Inc. v. N. L. R. B., supra, 296 F.2d at 621. A company can have dominant motives, mixed motives, equal motives, concurrent motives, and bewildering combinations of these, but "It must be remembered that the statute prohibits discrimination, and that the focus on dominant [or any other like adjective] motivation is only a test to reveal whether discrimination has occurred." id. at 621. To invoke § 8(a) (3), the anti-union motive need not be dominant (i. e., larger in size than other motives); in some cases it may be so small as the last straw which breaks the camel's back. We reiterate that all that need be shown by the Board is that the employee would not have been fired but for the anti-union animus of the employer. We therefore do not hold that in this case the general counsel must have shown "dominant" motive.

█ Indeed we do not here find it necessary to apply, as an aid, any test other than the pure statutory test of discrimination, for no matter how the General Counsel's evidence appears when looked at by itself, when viewed against the record as a whole, it is a fragile collation of suspected motives and speculative facts. In a word, it is insubstantial evidence.

"In the choice between lawful and unlawful motives, the record taken as a whole must present a substantial basis of believable evidence pointing toward the unlawful one." N. L. R. B. v. McGahey, 5 Cir. 1956, 233 F.2d 406, 413.

The evidence of discharge for absenteeism is direct and more nearly consistent. The company may have shown itself draconian, and even malevolent, but this alone cannot be alchemized into anti-union animus. The General Counsel has failed to carry his burden, and we hold that the finding that Mrs. Goodwin was discriminatorily discharged cannot stand.

### III.

█ While Mrs. Goodwin was in the hospital, however, the union filed its charge of unfair labor practice concerning her discharge. The company reacted strongly and rather candidly with its newly acquired knowledge, and Alred advised her by telephone when she asked to be rehired that her union membership and the filed charges "had a way of making things unpleasant" and refused to rehire her. What slight ambiguity there is in that phrase is washed away by Alred's admission at the trial that " * * * after consulting with other officials of the company we decided that under those circumstances [of the filing of charges by the union] we did not think it right to take * * * [Mrs. Goodwin] back." It is beyond cavil that these statements form substantial evidence to support the Board's finding that the company's refusal to rehire her was discriminatory.

█ We hold that where an employer refuses to rehire a former employee because the employee has filed unfair labor practice charges against the employer (no matter whether the original discharge was for reasons valid or invalid under the Act), the employer has violated § 8(a) (4). This court has held that an employer's refusal to *hire* (not rehire) an applicant because the applicant had given testimony in Board proceedings against a former employer violates § 8(a) (4). N. L. R. B. v. Lamar

Creamery Co., 5 Cir. 1957, 246 F.2d 8; [5] John Hancock Mutual Life Ins. Co. v. N. L. R. B., 1951, 89 U.S.App.D.C. 261, 191 F.2d 483; see Iowa Beef Packers, Inc. v. N. L. R. B., 8 Cir. 1964, 331 F.2d 176.

 The present case requires similarly broad reading of § 8(a) (4)'s words "or otherwise discriminate against an employee", or else discharged employees would risk losing all chance of re-employment by attempting to assert the rights which the Act gives. To allow this aspect of the unequal bargaining power between employer and employee to inhibit and frustrate the right to self organization would be to strike at the heart of the Act. What would be the value of the detailed rights given in § 7 if employees were afraid to assert them?

"Such breadth of statutory language [of § 8(a) (4)] is consistent only with an intention to prevent the Board's channels of information from being dried up by employer intimidation of prospective complainants and witnesses." John Hancock Mutual Life Ins. Co. v. N. L. R. B., supra, 191 F.2d at 485. See Oil City Brass Works v. N. L. R. B., 5 Cir. 1966, 357 F.2d 466.

We therefore agree with the Board's holding that the company's failure to rehire Mrs. Goodwin violated § 8(a) (4), and enforce its order that she be reinstated with back pay computed from the date of the company's first refusal to rehire her after the charges were filed.

### IV.

Section 10(c) of the Act, which gives the Board the authority to issue orders, indicates that such orders are to be confined to the findings of the Board.

 The general counsel did not charge, and the Board did not find, any violation by the company of § 8(a) (5), dealing with refusal to bargain collectively. The only reference to collective bargaining in any form in the record was the statement of Whitfield, III that the company would not sign any agreement with the union. This was found to be an § 8(a) (1) violation. As the record shows that the company has already signed an agreement, we feel that the question of collective bargaining is not sufficiently related to this case to justify the Board's cease and desist order on that subject. N. L. R. B. v. Sunnyland Packing Co., 5 Cir. 1966, 369 F.2d 787. The Board should strike the reference to failure to bargain collectively from paragraph 1(g) of its order and from the notice to employees to be posted by the company.

As to the finding of discriminatory discharge, enforcement is denied.

As to the other findings, the Board's order is enforced as modified herein.

---

5. In *Lamar Creamery* we found that the discriminatory refusal to hire gave rise to violations of both § 8(a) (3) and § 8(a) (4). The Board in the present case found a violation of § 8(a) (3) (in addition to § 8(a) (4)) in the failure to rehire Mrs. Goodwin. However, we do not find it necessary to pass on the § 8(a) (3) question here because a finding on it one way or another would not affect the remedy.