**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**FIBERS INTERNATIONAL CORPO-RATION, Respondent.**

No. 7645.

United States Court of Appeals, First Circuit.

March 4, 1971.

As Amended March 12, 1971.

Paul Elkind, Atty., N. L. R. B., with whom Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Warren M. Davison, Deputy Asst. Gen. Counsel, were on the brief, for petitioner.

Donald M. Hall, San Juan, P. R., with whom Radames A. Torruella-del-Valle, and McConnell, Valdes, Kelley & Sifre, San Juan, P. R. were on the brief, for respondent.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

ALDRICH, Chief Judge.

 Examination of the NLRB's yearly reports shows that much more often than not we have enforced the orders of the Board. There is one area, however, where we have never seen eye to eye: the test for determining wheth-

er a discharge for established misconduct was in fact an unfair labor practice. Having in mind that a business decision is involved, it has been our position that the Board has the burden of making a clear showing that the employer's dominant motive was not a proper business one, but union animus. In spite of constant reiteration,[1] neither our cases, nor even our statement of the principle, appear in trial examiners' discussions or Board opinions. This failure shows itself in the result.

The facts in the present case require a considerable exposition. In the fall of 1968 an open attempt was made by a union[2] to organize the Guayama, Puerto Rico, plant of Fibers International Corporation. The names of three employees, of which one Rubén de Jesús was listed second, appeared regularly on union leaflets. On January 23, 1969, a different type of leaflet was circulated endorsing the union, purportedly signed by some 95 employees. A number of these employees were disturbed by the use of their names. They asserted they had not authorized such circularization, and feared that it would cause them difficulties with the company. Ibzan Ortiz, a supervisor in de Jesús' department, assured the employees that there would be no reprisals. The company was engaged in collecting evidence to contest the union's conduct of the election, and Ortiz also announced that any employee wishing to make a written statement that he had not authorized the leaflet could do

so.[3] One of the employees who signed such a disclaimer was Luis Cruz. We proceed with four paragraphs from the examiner's report.[4]

"Around 4:30 on the afternoon of Tuesday, January 28 as the maintenance electricians who had just gotten off work were entering the company parking lot from the plant, De Jesus confronted Cruz about his giving the statement to the company. De Jesus started the conversation by taking hold of Cruz' right arm and asking him if he had made a statement for the company The two then got into an argument and de Jesus became somewhat vehement. According to him he accused Cruz of 'not telling the truth,' and made remarks impugning Cruz' manhood. According to Cruz, whom I credit, the argument continued as he got into his car at which point de Jesus took hold of his left arm. Two co-workers who rode with Cruz, Miguel Rivera and Carlos A. Colon, both corroborated his testimony that De Jesus used obscene language, calling him a homosexual and lacking sufficient manhood to stand behind what he had done. Both Cruz and Rivera testified that the last thing de Jesus said to Cruz was that they would see each other. [Footnote omitted.]

"De Jesus did not hurt Cruz when he took hold of his arm. But Cruz who on the stand appeared to be a timid man, was frightened. He took de

---

1. See, e. g., N.L.R.B. v. Agawam Food Mart, Inc., 1 Cir., 1970, 424 F.2d 1045, 1047, and cases cited; N.L.R.B. v. Gotham Industries, Inc., 1 Cir., 1969, 406 F.2d 1306, 1309 n. 5; N.L.R.B. v. Billen Shoe Co., 1 Cir., 1968, 397 F.2d 801, 803, and cases cited. No purpose would be served by collecting cases from other jurisdictions; we are aware of no substantial conflict.

   So that there may be no misunderstanding about what we mean by dominant motive, we state it again. Regardless of the fact that enforcing the penalty may have given the employer satisfaction because of the employee's union activities, the burden is on the Board to establish

that the penalty would not have been imposed, or would have been milder, if the employee's union activity, or a union animus, had not existed.

2. Oil, Chemical and Atomic Workers International Union, AFL-CIO.

3. A Board witness testified that Ortiz offered "some considerations" in return for such statements, but Ortiz denied this and the examiner credited Ortiz.

4. Except in a matter not relevant to this issue, the examiner's report was adopted by the Board. The Board's opinion is reported at 181 N.L.R.B. No. 93 (March 19, 1970).

Jesus' closing remarks as an assertion that in the future De Jesus would catch him outside the plant and do him harm.

"De Jesus denied telling Cruz he was a homosexual or grabbing him by the arm or telling him he would take care of him later. In view of the other evidence relating to these matters I do not credit de Jesus' denials.

"At the end of the argument de Jesus got into a car driven by fellow employee [Gazhound] Soto. As Cruz was driving out of the parking lot Soto's car blocked the way. It is not clear from the evidence what caused this. Soto denied that it was intentional. But Cruz in his frightened state of mind thought it was intentional."

The testimony before the examiner was even more colorful. Cruz and three others filed a written report on the incident with the company. When de Jesús was called to the office the day following Cruz' complaint and asked about it, he denied the event occurred. He stated, "I had a high concept of honor and * * * I did not speak badly to any human being, much less to a co-worker." A Mr. Gray thereupon discharged him. The following day de Jesús filed an unfair labor practice charge and gave a written report to the Board. He said nothing about the Cruz incident, although it had been the only subject mentioned at the discharge. On February 17 he gave the Board a second statement; on February 19 two more. In none did he mention the incident. Finally, on March 13, the Board representative, having learned of the Cruz matter, asked de Jesús about it. He testified,

"[T]hen I remembered that we had had a few words and I told them to the investigator, Mr. Sykora, in case it had any connection or could help in any way." This desire to "help in any way" had not caused the matter to occur to him before, he explained, "because that was not too important and besides there was nothing there that could be catalogued as an offense or as an agression so that somebody would complain and they would suspend me from my work." "[I]f Sykora had not touched that point during the investigation it would never have occurred to me."

Of course, as de Jesús knew, every part of this explanation, like his original denial, was totally untrue. In addition to what we have already recited, we note that he admitted on cross-examination that within a few days after his discharge he sought three witnesses to the parking lot occurrence, told them that this was why he was discharged, and asked them to give the Board absolving statements.

The trial examiner's reasons for his conclusion that the discharge of de Jesús was improperly motivated, even though he was guilty of misconduct,[5] meriting "some kind of disciplinary action," were several. First, the examiner found that he was "the outstanding union activist, [6] * * * which requires close scrutiny of the employer's motivation." Second, he noted that "[t]here is some evidence although not a great deal, of company union animus." We agree it was not a great deal.[7] Third, the report cites "the one-sided investigation of the parking lot incident. No effort was made to obtain de Jesús side of the story prior to his discharge. When on the

---

5. The examiner concluded, "[I]t is fair to say that he spoke to Cruz in angry abusive terms. Moreover, in view of his ill-tempered language emphasized by twice taking hold of Cruz' arm, his parting words indicating that they would see each other in the future was, in context, reasonably construed as a threat of future bodily harm."

6. It is not important, but no evidence, even from de Jesús, who was not given to modesty, indicated him to be "the" outstanding activist.

7. Essentially, in the course of an entire, open, campaign, one supervisor told one employee, out of 650, that he could advance faster if he did not join the union. The other remark claimed to show union animus on the part of the company we find entirely ambiguous.

afternoon of January 29 he was called into supervisor Gray's office and accused of improper conduct in the parking lot, he denied acting improperly and sought to learn who his accusers were. Instead of getting his side of the story, Gray fired him on the spot." We do not know what the examiner means by "no effort" to get de Jesús' "side of the story." It had his total denial. The investigation was "one-sided" because the four other witnesses disagreed with him. Two pages later, the examiner states his fourth reason, the "conclusion [of improper motive] is supported by the testimony of industrial relations supervisor Guerrero who made it clear that they carefully considered the case of de Jesús in order to make sure they had enough on him [8] to fire him."

The Board's brief says that this "is a classic 'pretext' case." The fact is, it is more a classic Board rationalization case. We are accustomed to the Board concluding that the employer must have been improperly motivated because it acted too slowly. E. g., N.L.R.B. v. Billen Shoe Co., n. 1, ante, at 803; N.L.R.B. v. Agawam Food Mart, n. 1, ante; cf. Board of Publication of Methodist Church v. N.L.R.B., 6 Cir., 1962, 297 F.2d 379, 380. In the case at bar it has achieved the millenium. Here the company is condemned for its haste. In the next breath it is criticized for its care.

■ Finally, the examiner reviewed seven of the company's prior disciplinary proceedings, five of which resulted in discharges. He concluded that all seven, including the two that did not result in discharges, were "more serious," and that nothing was called for here but "some modest disciplinary action." We cannot agree with the comparison, or with the conclusion. The examiner describes Cruz as a "timid" man, and found that de Jesús promise to catch him outside the plant frightened him, and reasonably caused him to fear future bodily harm. This was not a "modest" affair, or less serious than, for example, the instance of horseplay between friends, even though a knife was flashed. Nor was it an ordinary dispute. Considering how seriously the Board regards company misconduct that might be designed to influence employees to reject the union, we may fairly expect the Board to take equally seriously employee misconduct aimed in the other direction. In any event, an employer has a right to do so. Corriveau & Routhier Cement Block, Inc. v. N.L.R.B., 1 Cir., 1969, 410 F.2d 347, 350. Furthermore, as we had occasion to point out in Billen Shoe, n. 1, ante, no wise employer can afford to countenance deliberate misconduct by a union leader. This must particularly be so when a union leader asserts himself by chastizing an employee for giving the company a statement. That an employer lawfully engaged in seeking evidence of improper union conduct should have to tolerate as modest physical threats by coemployees to its witnesses seems inconceivable. The examiner's comparison of this matter with a previous disciplinary case involving an altercation over the quality of the soup shows singular lack of acumen.

■ We would consider it a gross miscarriage for the company to be saddled by Board action with this ill-behaved, not to mention perjurious, employee. If the Board wanted to overlook de Jesús obvious misconduct vis-a-vis itself, that was its affair. The company was not obliged to be as forgiving. No evidence warrants a finding that the company's decision, although no doubt pleasing to it, cf. N.L.R.B. v. Lowell Sun Pub. Co., 1 Cir., 1963, 320 F.2d 835, 842; N.L.R.B. v. Birmingham Pub. Co., 5 Cir., 1959, 262 F.2d 2, 9, was not motivated by proper business considerations. The section 8(a) (3) order requiring reinstatement and back pay must be vacated.

The Board's other finding is based on a barely warranted analysis of conflicting testimony.[9] We accept it as justify-

---

8. The examiner's translation of "enough facts."

9. See n. 7, ante.

ing an 8(a) (1) order, without intimating that it would have been enough to vitiate an election, had the union lost, which it did not. The 8(a) (1) order will be enforced. Respondent's argument was limited to the 8(a) (3) order, however, and costs will be charged against the Board.

## ON PETITION FOR REHEARING

### PER CURIAM.

■ The Board, dissatisfied with certain language in our opinion, seeks the excise of the words "clear" and "dominant" from the sentence in the first paragraph which ends as follows,

> " * * * the Board has the burden of making a clear showing that the employer's dominant motive was not a proper business one, but union animus."

In addition, the Board points to our statement in footnote 1 that "we are aware of no substantial conflict" with the other circuits, and cites cases which it says indicate that this is erroneous. The prime difficulty appears to be that the Board considers the word "dominant" to impose an undue burden upon it.

To dominate means to control. The "dominant" motive is the controlling or effective motive. We use this particular word because of its insistent quality, to remind the Board that its burden is to find that the improper motive was the one that in fact brought about the result.

In support of its petition the Board cites some fifteen cases, listing them by circuit. While none states that the improper motive must be "dominant," we consider the language of several to be indistinguishable. NLRB v. Milco, Inc., 2 Cir., 1968, 388 F.2d 133, 138 ("the true reason"); Hugh H. Wilson Corp. v. NLRB, 3 Cir., 1969, 414 F.2d 1345, 1352, cert. denied, 397 U.S. 935, 90 S.Ct. 943, 25 L.Ed.2d 115 ("the 'real' stimulus"); NLRB v. Buitoni Foods Corp., 3 Cir., 1962, 298 F.2d 169, 174 ("in fact motivated"); NLRB v. Central Power & Light Co., 5 Cir., 1970, 425 F.2d 1318, 1322 ("actually motivated"); NLRB v. Stemun Mfg. Co., 6 Cir., 1970, 423 F.2d 737, 741 ("the actual impelling motive"). It is true that the Board cites cases using general phrases indicating that a "partial" motive that is improper is enough. Some of these, however, proceed, in discussing the evidence, to apply a standard not significantly different from ours. E. g., NLRB v. Princeton Inn Co., 3 Cir., 1970, 424 F.2d 264; S. A. Healy Co. v. NLRB, 10 Cir., 1970, 435 F.2d 314. No case cited by the Board articulates a lesser requirement for finding a discharge to be an unfair labor practice. Even NLRB v. Whitfield Pickle Co., 5 Cir., 1967, 374 F.2d 576, on which the Board particularly relies, after saying that the "anti-union motive need not be dominant," goes on to say that the Board must show "that the employee would not have been fired but for the anti-union animus of the employer." 374 F.2d at 582. The only opinions not expressing that standard express none at all. We decline to delete the word "dominant."

With regard to our use of the word "clear" we do not mean, as the Board fears, that its burden of proof on this issue is any greater than it is on any other. However, our experience has been that from time to time the Board not only forgets that "partially motivated" means effectively motivated, but forgets that an aura of even strong union animus is not sufficient in itself, once an adequate and proper business reason has been established. While of course an employer who has good cause to apply a particular sanction may in fact do so for an impermissible reason, in such circumstances the Board must have an affirmative basis for believing that the employer rejected the good reason and chose the bad. It is not enough, as in the case at bar, to ignore or denigrate the business reason, or to substitute speculation in its place.

The petition is denied.