**PIONEER NATURAL GAS COMPANY,**
Petitioner-Cross Respondent,

v.

**NATIONAL LABOR RELATIONS
BOARD,** Respondent-Cross
Petitioner.

No. 80–2324.

United States Court of Appeals,
Fifth Circuit.*
Unit A

Nov. 30, 1981.

* Former Fifth Circuit case, Section 9(1) of Public
Law 96–452—October 14, 1980.

Locke, Purnell, Boren, Laney & Neely, Larry M. Lesh, Dallas, Tex., John Cosmic, Amarillo, Tex., for Pioneer Natural Gas Co.

Elliott Moore, Deputy Associate Gen. Counsel, Robert M. Smith, N.L.R.B., Washington, D. C., for the N.L.R.B.

Before THORNBERRY, REAVLEY and POLITZ, Circuit Judges.

REAVLEY, Circuit Judge:

An administrative law judge determined that the Pioneer Natural Gas Company had violated § 8(a)(1) and § 8(a)(3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (3) by interrogating and discriminating against certain employees. The National Labor Relations Board summarily affirmed the ALJ's "rulings, findings, and conclusions" and adopted his order with a slight modification.[1] Pioneer petitions for review, and the Board cross-petitions for enforcement of its order. We grant Pioneer's petition and deny enforcement.

I. *Background*

In March 1978, a union began a campaign to organize Pioneer's employees at Pioneer's several places of business. The campaign ended on October 13, 1978. There is no evidence in the record that Pioneer actively opposed this or any other union. The union simply failed to gain sufficient support from the employees. As the ALJ found, Pioneer demonstrated "little or no" anti-union animus.

The violations found in this case all occurred in one department on one floor in one of Pioneer's many facilities. This "gas

---

1. The ALJ neglected to incorporate one of the violations he found into his remedial order; the Board corrected this omission.

measurement" department had 17 non-supervisory employees; all but one were female. Five women worked under the supervision of James Blatzheim, the chief clerk of gas measurement; the others worked under the supervision of James Goldston, the computer supervisor. Both Blatzheim and Goldston reported to supervisor Bob Brotherton; Brotherton reported to Guy Bufkin, the Assistant Director of the Department; and Bufkin reported to Bob Spikes, the Director. With a single exception, all of the events involved three of the five employees who worked for Blatzheim—Ninnevah Kay Younger, Biolanda Benitez, and Deborah Gallegos (the "reprimandees").

The ALJ found, and the record makes clear, that, prior to June 1978, there was constant bickering between the three reprimandees and some of the women who worked for Goldston. On June 6, the three were called individually into Blatzheim's office and were reprimanded for criticizing, badgering, deliberately antagonizing, and threatening violence against Goldston's employees, and for making deliberate mistakes on the job and bragging that supervisors couldn't tell them what to do. That all of these charges had some basis in fact is established by the three reprimandees' own testimony at the hearing.[2] The ALJ found, however, that the reprimands were issued because two of the three had attended a union meeting on May 25, and because all three had thereafter distributed union cards and advocated the union.

The ALJ also found that two statements Blatzheim made to Younger on June 6, and two questions Goldston asked Benitez and another employee in late May and early June, were instances of "restraint and coercion" prohibited by § 8(a)(1).

Finally, the ALJ found that the discharge of Gallegos in June 1979, over eight months after the union campaign had ended, was in retaliation for her attempt to engage in "concerted activity" protected by § 7 of the Act, 29 U.S.C. § 157.

As we have said, all of the ALJ's determinations were affirmed by the Board.

## II. *Review of the Merits*

▮ We are, of course, bound by the Board's findings of fact if they are supported by substantial evidence in the record "considered as a whole." 29 U.S.C. § 160(e); *see Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). If the Board applies an erroneous legal rule in concluding that the facts establish a violation of the Act, however, we are not bound by the Board's conclusion that the Act has been violated. *See Allied Chem. & Alkali Workers v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 182, 92 S.Ct. 383, 399, 30 L.Ed.2d 341 (1971) ("the legal standard to be applied is ultimately for the courts to decide and enforce"). Instead, we apply the Board's factual findings to the correct legal standard. If the Board has not made a necessary finding, we may nevertheless sustain its conclusion if the record clearly supports the omitted finding. If the record is unclear, we may remand to the agency for further proceedings. If the record clearly provides no support for the necessary finding, however, we may deny enforcement without resort to remand. *See Delco-Remy Div., Gen. Motors Corp. v. NLRB,* 596 F.2d 1295, 1309–10 (5th Cir. 1979).

With these principles in mind, we review the Board's determinations on each of the alleged violations.

---

**2.** Benitez admitted that the three of them criticized the work of Goldston's employees "several times a month." Both Benitez and Younger admitted to criticizing Goldston and his predecessor. Younger admitted that, during the four or five months previous to May 18, 1978, Blatzheim had told her on "several occasions" that Goldston's employees were complaining about the three of them.

Benitez admitted to an incident in which she caused a confrontation by talking behind another employee's back, and another in which she caused a disturbance by verbally abusing Velma Hall, one of Goldston's employees. Both Younger and Benitez admitted to calling the supervisors "asses."

Younger also acknowledged an incident, occurring shortly before the time when Pioneer claims it decided to give the reprimands, in which Gallegos threatened to hit one of Goldston's employees with a bottle. Benitez admitted that, in another incident occurring around the same time, she "could have" stated that she would not do work assigned to her.

## A. *The Reprimands*

■ The ALJ concluded that the decision to reprimand Younger, Benitez and Gallegos was discrimination that violated § 8(a)(3) and § 8(a)(1) of the Act.[3] In order to prove that Pioneer discriminated against its employees, "the Board must show that the particular supervisor responsible for the [action] knew about [the employees'] union activities," *Delchamps, Inc. v. NLRB*, 585 F.2d 91, 94 (5th Cir. 1978), and that the employees' union activities were a "motivating factor" in the employer's action, *Delco-Remy*, 596 F.2d at 1305; *NLRB v. Whitfield Pickle Co.*, 374 F.2d 576, 582 (5th Cir. 1967) (anti-union animus must be a "but for" cause). In establishing the knowledge element, the Board may not simply "impute" the knowledge of a lower-level supervisor to the decision-making supervisor, *Delchamps*, 585 F.2d at 94; the Board may, however, "rel[y] on circumstantial evidence to infer that the knowledge of one supervisor has been communicated" to the other, *id.* at 95 (citing *Texas Aluminum Co. v. NLRB*, 435 F.2d 917, 919 (5th Cir. 1970)).

The ALJ found that Blatzheim learned on May 24 that Younger planned to attend a union meeting on May 25, and that he learned on May 26 that Younger was distributing union cards.[4] The ALJ also found that Goldston learned on May 25 that Benitez planned to attend the meeting. In addition, the ALJ noted that Blatzheim and Goldston worked in the vicinity of the three reprimandees.[5] From these facts, the ALJ found "that Respondent, through its supervisors Blatzheim and Goldston, was aware

of [the three employees' union] activities during late May, 1978."

■ The undisputed evidence shows, and the ALJ found, that neither Blatzheim nor Goldston made the decision to reprimand the three employees. That decision was made by Assistant Director Bufkin and Director Spikes. Neither the ALJ nor the Board found that Bufkin or Spikes was aware of the reprimandees' union activities, or that Blatzheim or Goldston communicated his knowledge to Bufkin or Spikes.[6] Thus, it is clear that the ALJ performed the "mechanical imputation" of knowledge rejected in *Delchamps*, 585 F.2d at 95.

The Board argues that, despite its failure to follow *Delchamps*, the circumstances surrounding the reprimand support the inference that Spikes and Bufkin knew of the reprimandees' union activities. We think that there is no support in the record for this inference.

The reprimandees' own testimony establishes that the reprimandees themselves were not aware of the union campaign before May 18, 1978. Pioneer claimed at the hearing that the decision to reprimand was made in April. Pioneer's supervisors testified that the continuing complaints from Goldston's employees about the reprimandees were brought to Bufkin's attention sometime in April. Bufkin testified that he and Spikes decided to reprimand the three, and had Goldston's employees reduce their complaints to writing. Even if the ALJ disbelieved this testimony, the General

---

3. Section 8(a) of the NLRA provides in pertinent part:

It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

. . . .

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . .

29 U.S.C. § 158(a)(1), (3).

4. Blatzheim admitted that he knew Younger had attended the meeting—she had volunteered

the information on May 24—but he denied knowing that she was distributing union cards.

5. There was no evidence that anyone knew of Gallegos' union activities. Moreover, Gallegos did not attend the union meeting of May 25. Younger and Benitez testified, however, that Gallegos helped them distribute union cards.

6. Nor was there any direct evidence that either Bufkin or Spikes was aware of the reprimandees' union activities. The only evidence on this issue was Bufkin's testimony denying knowledge. The ALJ failed to mention this testimony in his written decision.

Counsel was presented with two such written complaints at trial, and stipulated on the record that the written complaints were indeed given to management by two of Goldston's employees on May 7 and May 8.[7] The General Counsel also stipulated on the record that Goldston submitted a written statement concerning his employees' complaints on May 19, and that Blatzheim submitted his own written statement on May 22. All of this activity concerning the complaints occurred before Blatzheim or Goldston learned of the reprimandees' union activities, most of it before the reprimandees themselves even knew there was a union. There is no evidence in the record that, after they found out that Younger and Benitez had attended the union meeting, Blatzheim or Goldston participated in any way in the decision to issue the reprimands on June 6[8] or communicated their knowledge to Bufkin and Spikes during that period.

7. The documents themselves were not introduced into evidence and thus are not in the record.

8. Younger did testify that Blatzheim told her that he went to Bufkin on June 2 "to talk him out of the allegations." Blatzheim denied this, testifying that he did not even know until June 5 that a decision to reprimand had been made. The ALJ noted Younger's testimony in his review of the evidence, but made no factual finding on this issue. Even if Blatzheim did go to talk Bufkin out of the reprimand, however, this does not tend to prove that he communicated his knowledge of the reprimandees' union activities; on the contrary, it shows that he was making an effort to protect his employees from discipline.

9. We have held that the reviewing court is "not compelled to respect" credibility choices "based on an inadequate reason, or no reason at all." *NLRB v. Moore Business Forms, Inc.*, 574 F.2d 835, 843 (5th Cir. 1978). The ALJ discredited Blatzheim's denials because he found Blatzheim's testimony "inconsistent and conflicting" when Blatzheim attempted to quantify the number of times he had had problems with the reprimandees. We question this basis for rejecting Blatzheim's testimony for two reasons. First, the purported "inconsistencies" in Blatzheim's testimony do not exist. The ALJ said that Blatzheim first testified that he had orally reprimanded Younger "about 12 times," and later testified that he had orally reprimanded her "6 or 7 times." Actually, what Blatzheim said the second time was that

The Board argues that other circumstantial evidence, relied on by the ALJ in finding that the reprimand was motivated by the union activities, supports the inference that Bufkin and Spikes knew that the reprimandees were union supporters. The ALJ relied most heavily on two statements that, he found, Blatzheim made to Younger on June 6. Younger testified that, after Blatzheim had read to her the reprimand written by Spikes, he told her, "Maybe [the reprimand] has something to do with your union activities." Younger claimed that Blatzheim made a similar statement to her and her husband later that day in the company parking lot. Blatzheim denied making either statement, but the ALJ discredited his testimony.

Although we think that the ALJ's reasons for rejecting Blatzheim's testimony are unpersuasive,[9] we accept his credibility determination. Even so, we do not see how

he had reprimanded Younger "6 or 7 times" *on his own initiative*; a few questions later, he made it clear that he had reprimanded her "several" other times because of complaints from other supervisors about her dealings with employees under their supervision. The other inconsistency found by the ALJ was Blatzheim's first statement that Goldston complained about Blatzheim's employees "about a dozen" times, followed by a later statement that Goldston complained about Gallegos "about a dozen" times. Rather than inconsistent, this testimony was entirely consistent with Pioneer's supervisors' claims that the complaints were almost always made about the three reprimandees as a group. This testimony was also consistent with Blatzheim's statement that he never received a complaint concerning the other two of his five employees.

Second, and more importantly, we think that the ALJ's focus on a purported inconsistency in the use of round numbers stands in striking contrast with his disregard for the serious inconsistencies in Younger's story concerning this very issue and other substantial issues. On June 9, 1978, Younger circulated a letter among the supervisors denying the charges in the reprimand. At the same time or shortly thereafter, she circulated a second letter claiming that she was being discriminated against because of her union activities. In neither letter did she mention what one would think would be the crucial evidence supporting her complaint, Blatzheim's June 6 statements. On another of her claims—a frivolous charge that she had been "interrogated" by Pioneer's attor-

the two statements tend to prove that Bufkin or Spikes knew of Younger's union activities. First, under Younger's own description of the statements, Blatzheim did not purport to know the reason for the reprimands, much less know whether Bufkin or Spikes knew of Younger's union activities; he merely suggested a possible explanation for Younger's reprimand. Second, according to the ALJ's findings, Blatzheim was the only individual who knew of Younger's union activities. He was the only one who could have communicated information about Younger's union activities to Bufkin and Spikes. Since, under Younger's version of the facts, Blatzheim was acting as her confidant in revealing Pioneer's possible motives, we think it unlikely that he would also be informing the company of her union activities. The ALJ drew no such inference, and we refuse to draw it on review.

Nor do we think that any of the other circumstances relied on by the ALJ in finding causation provide substantial evidence for the inference that Bufkin or Spikes was aware of the reprimandees' union activities.[10] Since the Board has not proved this

element of its case, its conclusion that the reprimands violated § 8(a)(3) and § 8(a)(1) cannot be upheld.

### B. *The Section 8(a)(1) Violations*

The Board concluded that, in three separate instances, Pioneer had engaged in activity that tended "to interfere with, restrain [and] coerce employees" in violation of § 8(a)(1), 29 U.S.C. § 158(a)(1). One instance concerned Blatzheim's statements to Younger; the other two concerned questions Goldston asked Benitez and another employee.

### *Blatzheim's Statements*

[6] To establish a § 8(a)(1) violation, the Board need not show actual restraint or coercion; it need only draw from the credited evidence the reasonable conclusion that the employer's conduct would tend to restrain or coerce employees from engaging in protected activities. *See NLRB v. Henriksen, Inc.*, 481 F.2d 1156, 1161–62 (5th Cir. 1973); *NLRB v. Varo, Inc.*, 425 F.2d 293, 298 (5th Cir. 1970). In reviewing the reasonableness of the Board's conclusion, the court "must recognize the Board's compe-

ney in a phone conversation she had initiated—she changed her story several times, first swearing in an affidavit that she had "forgotten" that the man was Pioneer's attorney, then "clarifying" her story in a second affidavit swearing that she did not know at any time prior to the phone call that the man was Pioneer's attorney, and finally admitting at the hearing that she did know that the man was Pioneer's attorney when she called him. The attorney testified and further contradicted Younger's testimony in many important respects. Younger also denied ever making derogatory statements about Goldston's employees; this testimony was contradicted by co-reprimandee Benitez. Finally, Younger changed her testimony on other matters when confronted with the truth.

Despite the conflicts in her sworn statements, the ALJ found Younger's testimony "candid and consistent."

**10.** The ALJ noted Blatzheim's admissions that the charges were "vague" and "individually" did not warrant more than an "oral" reprimand. The ALJ fails to note that management could easily have decided that "collectively" the charges were worthy of a reprimand, and that the evidence in the record, while not specific on dates and events, establishes that the

three reprimandees had collectively committed the transgressions generically described in the reprimand. *See* note 2 *supra.*

The ALJ also found the "timing" of the reprimands suspect, pointing out that the reprimands were not issued until over a month after the date Pioneer claimed it had made the decision to reprimand. The record demonstrates, however, that Pioneer was taking time to make sure that the reprimands were accurate: for example, by obtaining written statements from the complaining employees on May 8 and 9, and by obtaining statements from Goldston and Blatzheim on May 19 and 22. The fortuity that the reprimandees joined a union on May 24 does not protect them from discipline imposed in good faith on the basis of complaints made before that time. We think the "timing" factor is little more than a makeweight.

Finally, the ALJ noted that Pioneer had not reprimanded Vera Isham, another "troublemaker" in the department. The reason for this "disparity" was obvious: Isham was one of the very employees who had decided to take their complaints about the reprimandees up the company's chain of command; no similar complaint had been pressed by the reprimandees (or anyone else) against Isham.

tence in the first instance to judge the impact of utterances made in the context of the employer-employee relationship." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 620, 89 S.Ct. 1918, 1943, 23 L.Ed.2d 547 (1969).

■ The ALJ concluded that Blatzheim's two statements on June 6 "would clearly tend to restrain and coerce employes [*sic*] from engaging in union activities." We do not think that this conclusion could reasonably be drawn from the credited evidence.

Blatzheim's first statement, as recounted by Younger, was made in Blatzheim's office after he had read the reprimand written by Spikes. Younger told Blatzheim that she didn't understand the charges. Blatzheim replied, "I don't understand them either, Kay. Maybe it has something to do with your union activities." If this incident were taken in isolation, perhaps the Board could reasonably have concluded that Blatzheim saw the reprimands as an opportunity to discourage Younger from further participation in the union campaign. The statement, however, must be taken in the context in which Younger claims it was made. Later that same day, Younger claimed that Blatzheim spoke to her and her husband in the parking lot. Blatzheim told Mr. Younger, "I don't know what's going on. I don't understand it. It's got to be something with Kay with her union activities. I think, Bob, *I would get a lawyer and I'd see if I could get something done on that*" (emphasis added). This second statement, rather than one that "would clearly tend to restrain and coerce," was a statement encouraging Younger to assert her rights. Indeed, the very picture that Younger attempted to paint with her testimony, which the ALJ credited, was that Blatzheim was on her side concerning the union issue: Younger testified that when she first mentioned the union to Blatzheim on May 24, Blatzheim replied that the union would be "a good thing for you"; that Blatzheim later told her that he had tried to talk Bufkin out of the reprimands on June 2; and that Blatzheim repeatedly told her on

June 6 that he did not think that her reprimand was justified.[11] In fact, Younger believed that Blatzheim was such an ally and friend of the union cause that she asked him to testify for the union in this case.

We think it was unreasonable for the Board to conclude that two statements, which Younger herself considered to be sympathetic statements of support for her and her union activities, tended to restrain or coerce employees in the exercise of their rights. We think it even more unreasonable to find that the statements constituted unfair labor practices on the part of Pioneer, which demonstrated no anti-union animus, engaged in no active campaign of opposition to the union, and in fact encouraged its employees to listen to what the union had to say.

*The Interrogations*

Reprimandee Benitez testified that, on May 25, 1978, Goldston asked her if she was going to the union meeting that night, and pointed out that unionization "had its good points and its bad, you know, and I had to take it into consideration that Pioneer had good benefits." Another employee, Maria Escoto, testified that on June 1, 1978 Goldston asked her, after a conversation in his office on other subjects, whether she had signed a union card. When she did not respond, he said that "they would know who filled one out and who didn't."

■ In contrast to his conclusion concerning Blatzheim's statements, the ALJ did not expressly find that Goldston's two questions had a tendency to coerce. Rather, he merely described the two incidents and concluded, in effect, that they were *per se* violations of § 8(a)(1). This was error. "It is well established in this Circuit that interrogation of employees is not illegal *per se*.... 'To fall within the ambit of § 8(a)(1), either the words themselves or the context in which they are used must suggest an element of coercion or interference.'" *Delco-Remy*, 596 F.2d at 1309 (quoting *NLRB v. J. Weingarten, Inc.*, 339

---

11. Blatzheim denied making any of these statements.

F.2d 498, 500 (5th Cir. 1964)). In *Delco-Remy*, we made it clear that the Board must consider a number of criteria in determining whether the questioning "suggest[s] an element of coercion or interference":

"(1) the history of the employer's attitude towards its employees; (2) the type of information sought or related; (3) the company rank of the questioner; (4) the place and manner of the conversation; (5) the truthfulness of the employee's responses; (6) whether the employer had a valid purpose in obtaining the information; (7) if so, whether this purpose was communicated to the employee, and (8) whether the employer assures employees that no reprisals will be taken if they support the union."

596 F.2d at 1309 (quoting *NLRB v. Aero Corp.*, 581 F.2d 511, 514 (5th Cir. 1978)). This list is not definitive, and the Board may find that other factors suggest an element of coercion, even when the listed factors "cut in favor of the employer." *NLRB v. Camco, Inc.*, 340 F.2d 803, 804 (5th Cir.), *cert. denied*, 382 U.S. 926, 86 S.Ct. 313, 15 L.Ed.2d 339 (1965). We made it clear in *Delco-Remy*, however, that the Board may not ignore these factors and find a § 8(a)(1) violation "in a conclusory fashion." 596 F.2d at 1309. As in *Delco-Remy*, that is exactly what the Board did here; and, as in *Delco-Remy*, we find that the record does not support the Board's conclusion. *See id.* at 1310–11.

■ Goldston's question to Benitez is the kind of casual question that this court has never held to be a § 8(a)(1) violation. *See Delco-Remy*, 596 F.2d at 1310; *Mueller Brass Co. v. NLRB*, 544 F.2d 815, 820–21 (5th Cir. 1977) (involving more intrusive questioning against a clear history of strenuous anti-union activity); *NLRB v. O. A. Fuller Super Markets, Inc.*, 374 F.2d 197, 203 (5th Cir. 1967). Certainly there is nothing inherently coercive about the lowest-level supervisor asking an employee, with whom, as the record clearly demonstrates,

he engaged in friendly conversation on a daily basis, whether she was going to attend a union meeting, and observing that unionization has "its good points and its bad." "[I]nterrogation which is not in itself threatening ... must meet fairly severe standards, normally including the showing of a background of employer discrimination and a demonstration that the circumstances of the interrogation would reasonably induce fear of reprisal." *O. A. Fuller Super Markets*, 374 F.2d at 203. Pioneer has no history of anti-union discrimination. The three-sentence conversation took place when Benitez wandered into another employee's office, where Goldston was already engaged in conversation with the other employee. Benitez had no hesitation in telling Goldston that she planned to attend the meeting. Finally, Goldston's "good points and bad points" remark negated any implication that Pioneer intended to take reprisals against those who attended the meeting.

■ Similar considerations apply to the Goldston-Escoto conversation. The Board points out that this conversation took place in Goldston's office, that Escoto declined to answer Goldston's question and that Goldston's remark—"they would know who filled [a card] out and who didn't"—could have been taken as a veiled threat of reprisal. Escoto, however, did not testify that she took the remark that way.[12] Goldston testified that he meant the remark as a joke, and Escoto did not contradict this testimony. Moreover, the conversation took place just two days after Bufkin had made a speech telling the employees to attend union meetings if they wanted to. On a record as barren as this one of any active opposition to the union, any systematic interrogation of employees, or any other circumstances suggesting an element of coercion, we cannot uphold the conclusion that this single incident is a violation of § 8(a)(1). *Cf. Delco-Remy*, 596 F.2d at 1306–11 (three interrogations, each more lengthy and intrusive than one at issue

---

**12.** Escoto simply recounted the incident. She did not testify that she felt intimidated or even

upset by Goldston's remarks.

here, held not a § 8(a)(1) violation despite background of company opposition to union).

## C. *The Discharge of Gallegos*

On Friday, June 22, 1979, eight months after the union campaign had ended, Velma Hall, a black employee, went to Goldston to complain about a problem. On Monday, June 25, Goldston had Hall put her problem in writing. Hall wrote in her own hand that, every single day from June 19 through June 22, Deborah Gallegos had repeatedly informed her that Helen Wilborn, another co-worker, had said "that she didn't like to error check with me and that she just don't like niggers." Hall's written statement related that she had "error checked" with Helen several times that week and had had no problems with Helen. After each session, however, Gallegos would come to her and repeat the racial insults that Helen had allegedly made. On Wednesday, Hall wrote, "all [Gallegos] did was tell me what Hellen [sic] said." On Thursday, "she just kept on telling me things like this . . . ." Finally, on Friday morning, Hall reported, "I think that Deborah wanted me to have words *with Hellen* about what she had told me. But I just looked over it. That morning after I had finish [sic] error checking with Hellen, no problems at all, . . . Deborah . . . called me into [an office]. I went to see what she wanted not thinking it would something else Hellen said . . . . I told her that I was so tired of her telling me every day something about what Hellen had

said and to just [have] Hellen tell me. I told her I was going to tell James [Goldston] about it because if I didn't know how to error check that he would see to it that I learn how, and she went on telling me that Hellen said this and Hellen said that so I just went right to James' office and told him about it" (emphasis added).

The day after Hall wrote this account, Bufkin called Gallegos into his office and asked if she had made these statements. Gallegos admitted that she had, but said that Wilborn had actually made the statements to her. Bufkin fired Gallegos on the spot, reminding her that this was the kind of conduct for which she had been reprimanded. That evening, Hall became so afraid that Gallegos would take reprisals against her that she had to have two police officers escort her home.

The ALJ concluded that Gallegos' behavior was "concerted activity" under § 7 of the Act, 29 U.S.C. § 157,[13] and that Gallegos was discharged for engaging in such activity in violation of §§ 8(a)(3) and 8(a)(1). The ALJ credited Gallegos' testimony[14] that she encouraged Hall to go to Goldston with "the Wilborn matter" because she "felt" that "that was the best way to go about it instead of us taking care of it ourselves. That way [Goldston] would know what was said and who said it and that way we can clear it up." The ALJ concluded that Gallegos' behavior was concerted activity because it related to "a matter of common concern"—an atmosphere of racial tension.[15]

13. Section 7 provides in pertinent part:
 Employees shall have the right . . . to engage in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities . . 29 U.S.C. § 157.

14. Gallegos' testimony was often incomplete or at odds with Hall's story. Gallegos testified that Wilborn made the racial insults on June 22, when Hall left work early, and that she told Hall about them on June 25, whereupon Hall went directly to Goldston. According to Hall's written statement, Gallegos had been reporting these remarks since June 19, and Hall went to Goldston on June 22 after five days of reports and after Gallegos' suggestion that Hall con-

front Wilborn. Gallegos also claimed that Hall "knew how Helen was on racial problems" and had heard derogatory comments from Wilborn in the past. Hall, however, testified that when she went to Goldston she did not believe that Wilborn had made the statements.

15. The ALJ relied on *Alleluia Cushion Co.*, 221 N.L.R.B. 999 (1975), as explained by the Board in *Diagnostic Center Hosp. Corp.*, 228 N.L.R.B. 1215 (1977). In those cases, the Board established the rule that actions taken by an individual employee are "concerted activity" if they relate to "a matter of common concern." We do not regard the *Alleluia Cushion* doctrine to be consistent with our decision in *NLRB v. Buddies Supermarkets, Inc.*, 481 F.2d 714 (5th

It is unbelievable that Gallegos was at all concerned about the work atmosphere. When asked on cross-examination why she did not go herself to complain to a supervisor, Gallegos replied that Wilborn's alleged racial remarks—including remarks insulting Gallegos' own race and her husband's race—"didn't bother me that much." It was only after a week of harassing Hall, and after suggesting that Hall confront Wilborn, that Gallegos suggested that Hall go to a supervisor.[16]

 Even if we accept the Board's finding that the work atmosphere was Gallegos' concern, however, we doubt that Gallegos engaged in any "concerted activity" protected by § 7. In the leading case of *Mushroom Transportation v. NLRB*, 330 F.2d 683 (3d Cir. 1964), the court held that advising another employee of his rights is not "concerted activity." In order for conversations between two employees to constitute "concerted activity," there must be "some element of collective activity or contemplation thereof." *NLRB v. Buddies Supermarkets, Inc.*, 481 F.2d 714, 717 (5th Cir. 1973) (citing *Mushroom Transportation*). There is no evidence in the record that Gallegos ever proposed collective activity to Hall; the only evidence is that she told Hall to go to a supervisor. While Gallegos may have "felt" that this was the best way for "us" to handle it, there is no evidence that she ever expressed her "feeling" to anyone else or suggested that going to Goldston would be a collective effort.

 Thus, the only ground on which we could hold that Gallegos engaged in concerted activity is that she "contemplated" group action. Even if we could hold that such personal "contemplation" is sufficient, however, we cannot uphold the Board's conclusion that Pioneer violated § 8(a)(3) and

§ 8(a)(1) by discharging Gallegos because there is no evidence that Gallegos' discharge was motivated by participation in the protected activities she "contemplated." Bufkin and Brotherton made the decision to discharge Gallegos. There is no evidence that either Bufkin or Brotherton knew that Gallegos had told Hall to go to a supervisor. All Bufkin and Brotherton had before them was Hall's written statement. This statement does not indicate that Gallegos ever suggested that Hall go to management to complain; the only suggestion recounted in the statement is that Hall directly confront Wilborn. Furthermore, there is no evidence that, when Bufkin called Gallegos in to ask her whether she had indeed made the statements that Hall attributed to her, Gallegos ever told Bufkin or Brotherton that she suggested that Hall go to management; she merely insisted that what she had said about Wilborn was true. Thus, there is no evidence to support the ALJ's conclusion that "Gallegos was discharged because she insisted that Hall go to her supervisor and 'clear it up.'" Since Bufkin and Brotherton did not know that Gallegos told Hall to go to her supervisor, they could not have fired her for that reason. Therefore, her participation in concerted activity could not have been a motivation for her discharge.

ENFORCEMENT DENIED.

Cir. 1973). *See NLRB v. Datapoint Corp.*, 642 F.2d 123, 128–29 (5th Cir. 1981); *NLRB v. Dawson Cabinet Co.*, 566 F.2d 1079, 1083 (8th Cir. 1977) (concluding that *Alleluia Cushion* is inconsistent with *Buddies Supermarkets* and rejecting *Alleluia Cushion*); *NLRB v. Bighorn Beverage*, 614 F.2d 1238, 1242 (9th Cir. 1980) (also rejecting *Alleluia Cushion*). The Board, however, does not attempt to defend the *Alle-luia Cushion* doctrine in this case; instead, it argues only that Gallegos engaged in concerted activity under our case law.

16. Moreover, Hall testified that the reason Gallegos gave her for going to Goldston was that Wilborn "never did anything. She [was] always coming out smelling like a rose."