**BOROUGH OF POTTSTOWN, Petitioner,**

v.

**PENNSYLVANIA LABOR RELATIONS BOARD, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Feb. 9, 1998.

Decided April 1, 1998.

Thomas G. Sevodidio, Philadelphia, for petitioner.

Elizabeth Kelly, Harrisburg, for respondent.

Ralph J. Teti, Philadelphia, for intervenor.

Before PELLEGRINI and LEADBETTER, JJ., and JIULIANTE, Senior Judge.

PELLEGRINI, Judge.

The Borough of Pottstown (Pottstown or Borough) appeals a final order of the Pennsylvania Labor Relations Board (PLRB) finding that Pottstown engaged in an unfair labor practice by discharging Robert Weidensaul (Weidensaul) in violation of Sections 6(1)(a) and (c) of the Pennsylvania Labor Relations Act (PLRA)[1] as read with the Act of June 24, 1968, P.L. 237, *as amended,* 43 P.S. §§ 217.1–217.10 ("Act 111").

At the core of this case is the relationship between Pottstown and Philadelphia Steam Fire Engine Co. No. 1 (Philadelphia Volunteers). Philadelphia Volunteers is one of four volunteer fire companies in Pottstown.[2] Each is an independently incorporated nonprofit organization created to fight fires in Pottstown and operates under its own bylaws and internal operating procedures. Each has an independent management structure and is governed by a board of engineers, duly appointed by the president[3] and a company chief. Elected by the volunteer fire company membership to a four-year term, each company chief is responsible for the day-to-day operations of the volunteer fire company and the conduct of its members, but consults with the company president in making any disciplinary decisions. Under its bylaws, the company chief is responsible for promulgating standard operating procedures for each volunteer fire company and participates in the hiring, evaluation and firing of any volunteer fire company employee. During the period in question, Joe Groff was Philadelphia Volunteers' company chief. While Philadelphia Volunteers, as does the other three volunteer fire companies, fights

fires with volunteer members, it also employs three paid drivers to drive the fire trucks to fire scenes as well as performing janitorial duties at the fire company station.

Surprisingly, there is very little law governing the relationship between volunteer fire companies and local municipalities that they were created to serve. Perhaps the most exhaustive treatment of that relationship is set forth in *Zern v. Muldoon,* 101 Pa.Cmwlth. 258, 516 A.2d 799 (1986), where this court set forth a short history of that relationship. In *Zern,* we quoted from *Commonwealth v. Barker,* 211 Pa. 610, 61 A. 253 (1905), where our Supreme Court upheld annual appropriations to volunteer fire fighting associations, even though they were private organizations, and characterized the relationship as follows:

> The protection of the city from fire is a municipal function of the highest importance, and as said in the case just cited 'a judiciously administered pension fund is doubtless a potent agency in securing the services of the most faithful and efficient class of men.' At the time of the passage of the ordinance the city had no paid fire department and the appellant association was performing that part of the city's municipal functions. The fact that it was doing so voluntarily did not make it any the less eligible for appointment as the *city's agent* in that regard.

*Barker* at 614, 61 A. at 254. (citation omitted) (emphasis added). To become a city's agent to fight fires in a particular municipality is dependent upon designation by the local municipality as the volunteer fire company authorized to fight fire within its geographical confines. *See Lacey Park Volunteer Fire Company No. 1 v. Board of Supervisors of*

---

**1.** Act of June 1, 1937, P.L. 1168, *as amended,* 43 P.S. §§ 211.6(1)(a) and (c). Section 6(1)(a) of the PLRA provides:

It shall be an unfair labor practice for an employer—To interfere with, restrain or coerce employes in the exercise of the rights guaranteed in this act. (footnotes omitted).

Section 6(1)(c) of the PLRA provides, in part:

It shall be an unfair labor practice for an employer—By discrimination in regard to hire or tenure of employment, or any term or con-

dition of employment to encourage or discourage membership in any labor organization …

**2.** The three remaining volunteer fire companies operating in Pottstown are Empire Hook & Ladder Company, Goodwill Fire Company and North End Fire Company.

**3.** During the period in question, Charlie Pierce was president of the Philadelphia Volunteers.

*Warminster Township,* 27 Pa.Cmwlth. 54, 365 A.2d 880 (1976).[4]

Pottstown has designated Philadelphia Volunteers and three other volunteer fire companies as composing its fire department (Pottstown Code, § 254) and exercises regulatory control over them through the Pottstown Code.[5] *See also* The Borough Code, Act of February 1, 1966, P.L. (1965), *as amended,* 53 P.S. §§ 45101–48501. Under the Pottstown Code, the borough fire chief, a part-time employee of Pottstown, supervises and directs the volunteer fire companies fire fighting capabilities. (Pottstown Code § 255). He assigns each fire company its duties and may dismiss any fire company when its services to Pottstown are no longer necessary. (Pottstown Code § 262(1)). The borough fire chief can establish and effectuate "policy, rules and regulations, practices and procedures" required to operate the Pottstown fire department. (Pottstown Code § 262(2)). The borough fire chief may also suspend any member of the fire department, i.e., any member of a volunteer fire company, for *insubordination at a fire.* (Pottstown Code § 262(3)).

While the borough fire chief has overall supervisory responsibilities for controlling the four volunteer fire companies, the Pottstown Code designates each of the volunteer fire company chiefs as an assistant borough fire chief. (Pottstown Code § 258). An assistant borough fire chief, when the borough fire chief is absent and only if most senior, is to coordinate fire fighting activities at the scene of a fire. Each assistant borough fire chief receives compensation "as the Borough Council shall from time to time determine to be paid semiannually from the Borough Treasury." (Pottstown Code § 260).

When the paid drivers decided to unionize, because of this intertwined relationship, even though paid drivers were hired and fired by the volunteer fire companies, the PLRB held that Pottstown and Philadelphia Volunteers were joint employers over the paid drivers for collective bargaining purposes.[6] Because volunteer fire companies are private entities and not within jurisdiction of the PLRB, this dispute involves under what circumstances is Pottstown responsible for unfair labor practices committed by Philadelphia Volunteers, its joint employer.

This question was presented to the PLRB as a result of an unfair labor practice filed by Local 3536 of the International Association of Firefighters (Local 3536) involving the termi-

---

**4.** Several statutes provide volunteer fire companies with particular benefits, including: volunteer firefighters may become special fire police with full power to regulate traffic, control crowds and exercise all other police powers necessary to facilitate the fire company's work at a fire or any other emergency, *see* Section 1 of the Act of June 18, 1941, P.L. 137, *as amended,* 35 P.S. § 1201; volunteer fire companies are exempt from vehicle title and registration fees, *see* 75 Pa.C.S. § 1901(b)(2); volunteer fire companies are eligible for low interest state loans in order to purchase equipment, *see* Section 1 of the Act of July 15, 1976, P.L. 1036, 72 P.S. § 3943.4; an employer may not terminate a volunteer firefighter for missing work while responding to a fire call, *see* Section 1 of the Act of December 1, 1977, P.L. 249, 43 P.S. § 1201; firefighters are covered under the provisions of the Pennsylvania workers' compensation act when engaged in fire fighting activity, *see* Section 601 of the Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. § 1031; boroughs may enact legislation and make regulations for fire safety, *see* Section 1202 of the Act of February 1, 1966, P.L. (1965) 1656, *as amended,* 53 P.S. § 46202, and may make appropriations to volunteer fire companies, *see* Section 1302 of the Act of February 1, 1966, P.L.

(1965) 1656, *as amended,* 53 P.S. § 46302; the state may regulate relief companies, *see* Section 1 of the Act of June 11, 1968, P.L. 149, 53 P.S. § 8504; and a fire station is exempt from property taxes, *see* Section 202 of the Act of May 21, 1943, P.L. 571, *as amended,* 72 P.S. § 5453.202.

**5.** Prior to the PLRB's final decision, Pottstown amended its municipal ordinance (Ordinance 1830) "to revise and modify certain powers and duties of the [borough] fire chief; to establish the composition and role of the borough fire committee; [and] to provide for independent internal organization of the volunteer fire company." We note, however, that these amendments are not pertinent to our appellate review since they were enacted in September 1996, eight months after Weidensaul's termination.

**6.** The PLRB's decision was affirmed by this Court in the unreported decision of *Borough of Pottstown v. Pennsylvania Labor Relations Board,* (No. 389 C.D.1996, filed September 8, 1997), *petition for allowance of appeal denied,* 548 Pa. 620, 693 A.2d 590 (1997). The parties to this action have stipulated to the incorporation of the entire record from that proceeding into the Record of this proceeding.

nation of Weidensaul. Since June 1987, Philadelphia Volunteers employed Weidensaul as a paid driver. In 1990, he began having discussions with other volunteer fire company employees concerning unionization of their work force under Local 3536. By 1993, Weidensaul had become more active in encouraging unionization of the paid drivers by soliciting signatures for union authorization cards and attending meetings to advocate unionization. Partly as a result of Weidensaul's efforts, Local 3536 filed for and was granted certification as the exclusive bargaining representative for all full-time and regular part-time paid fire officers and firefighters of Pottstown.[7] In January 1995, unrelated to his union activities, Weidensaul, along with six other drivers, filed a federal lawsuit against three of the four fire companies[8] alleging that the fire companies had failed to compensate their drivers for certain overtime pay in violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* (FLSA).

Following the filing of the FLSA lawsuit, Weidensaul was involved in the following incidents:

*January 17, 1995*

The Philadelphia Volunteers president posted a memorandum on the fire station bulletin board alerting Philadelphia Volunteers that a FLSA suit had been filed and Weidensaul was a named plaintiff. The memorandum stated that Weidensaul was jeopardizing his job and that all members should express their feelings about the FLSA suit to Weidensaul at a February 2, 1995 meeting.

*February 8, 1995*

Weidensaul failed to timely respond to a fire radio call and arrived at the scene of a gas leak fire late. His discipline was suspension for one 24-hour shift.

*May 26, 1995*

Weidensaul responded to a fire call and damaged a stop sign while maneuvering down a narrow street but failed to report the incident in violation of Philadelphia Volunteers' policy. When questioned, he denied running over the sign. His discipline was suspension for two 24-hour shifts.

*February 8-9, 1996*

In an attempt to catch an employee who was stealing liquor from the Philadelphia Volunteers bar, Weidensaul was captured on videotape appropriating 2-liters of soda, some candy bars and several quarters from the Children's Christmas Fund collection jar.

On February 12, 1996, as a result of his theft, the board of engineers and the company chief terminated Weidensaul.[9]

On February 14, 1996, Local 3536 filed an unfair labor practice charge[10] on behalf of Weidensaul against Pottstown and Philadelphia Volunteers as joint employers and the PLRB issued a complaint pursuant to the charge.[11] After receiving evidence, the hearing examiner issued a proposed decision and order concluding that Pottstown and Philadelphia Volunteers "seized upon . . . [various] situation[s] to discipline Mr. Weidensaul as another step in the plan to discharge him for union activity . . . during this time period . . . [Philadelphia Volunteers'] management was bent on revenge because of [Weidensaul's] union activity and the filing of the FLSA

---

7. Local 3536's representation did not include the borough fire chief, fire marshal or any managerial employees.

8. The three volunteer fire companies involved in the FLSA suit were Philadelphia Volunteers, Empire Hook & Ladder Company and North End Fire Company.

9. We note that events characterized as unfair labor practices must in and of themselves substantively support the underlying charge because a subsequent discharge alone is insufficient to support this contention. *See Pennsylvania Labor*

*Relations Board v. Frank V. Rizzo,* 21 Pa.Cmwlth. 216, 344 A.2d 744 (1975).

10. The unfair labor practice charge stated "that . . . Pottstown and [Philadelphia Volunteers] . . . engaged in unfair labor practices contrary to the provisions of [PLRA], Section 6, subsection (1), clause(s) (a), (c) and (d)."

11. Local 3536 also alleged a violation of Section 6(1)(d) of the PLRA against Pottstown and Philadelphia Volunteers, but the hearing examiner found no evidence to support this allegation and dismissed it from the complaint.

suit."[12]   The hearing examiner reviewed each of the principal events constituting anti-union animus and concluded the following regarding each of the incidents:

*January 17, 1995*

The Philadelphia Volunteers' president's memorandum posting and subsequent conduct was anti-union animus because a named plaintiff pursuing a FLSA lawsuit is a protected union activity under *Triangle Tool and Engineering,* 226 NLRB 1354, 94 LLRM 1108 [1976 WL 7599] (1978) and *Apollo Tire Co., Inc.,* 236 NLRB 1627, 99 LLRM 1138 [1978 WL 7660] (1978), *enf'd,* 604 F.2d 1180 (9th Cir.1979).

*February 8, 1995*

Because Weidensaul arrived to the scene of the gas leak late, and did not fail to show up at all, as characterized by Philadelphia Volunteers, Weidensaul's discipline was an overreaction to and exaggeration of the incident. Weidensaul would not have been disciplined had it not been for his union activities.

*May 26, 1995*

Weidensaul's running over the stop sign was not as serious as suggested by Philadelphia Volunteers. Further, it was understandable that Weidensaul denied that the event occurred because he was aware of the anti-union animus directed toward him by the members of Philadelphia Volunteers and it was not likely that he would receive a fair investigation of the incident. The discipline in this instance was another step in the plan to discharge him.

*February 8–9, 1996*

Weidensaul's theft was sufficient in other circumstances to justify his discharge, however, he might only have been disciplined had there not been anti-union animus toward him from Philadelphia Volunteers.[13]

Because "the Borough's assistant fire chiefs—the chiefs of the fire companies—serve as agents of the Borough on site at the volunteer fire companies, and are involved in the daily direction of the employes on site...."[14], the hearing examiner imputed the conduct of Philadelphia Volunteers to Pottstown and found that both had commit-

---

**12.** Weidensaul alleges and the hearing examiner accepted as fact that he was the target of several instances of anti-union animus. In the summer of 1993, Weidensaul received a verbal reprimand that was documented for the unauthorized use of equipment when he used a fire truck to collect union dues. In September 1993, Weidensaul was accused of stealing cigarettes from the fire station bar but was never disciplined. After filing the FLSA lawsuit, Weidensaul found "Dr. Kevorkian" notes in areas where he would be sure to find them; a help wanted sign was posted on the bulletin board for an emergency medical technician (EMT) although Weidensaul had EMT certification with the volunteer fire company; "loyalty" signs were posted; "cave man" cartoons were posted on the bulletin board to denigrate unions; Weidensaul's name was crossed out from an invitation list for an appreciation night event to which all members of the volunteer fire company were invited; and when he left his helmet overnight at the station, Weidensaul found it the next day with the eyes gouged out. Weidensaul also contends that he began to experience harassment outside of the work place at his home including a Valentine's Day card containing a death threat and a smashed car window.

**13.** In addition to the incidents leading to his discharge on February 12, 1996, Weidensaul was involved in other incidents regarding his conduct at work:

*Summer 1993*
Weidensaul received a verbal reprimand, documented in writing, for the unauthorized use of fire company equipment.
*September 1993*
Groff and chief engineer Stillings accused Weidensaul of stealing cigarettes from the bar. Weidensaul agreed to pay for the cigarettes but was not disciplined for the incident.
*June 16, 1995*
Weidensaul received another verbal reprimand, documented in writing, for the unauthorized use of fire company equipment because he used a fire truck to collect union dues from members at another volunteer fire company.

**14.** The hearing examiner also based his decision in part on a previous proceeding. In Local 3536's certification petition, reported at *Pottstown Borough,* 27 PPER ¶27043 (Final Order, 1996), the PLRB, in its final decision dated January 16, 1996, concluded that "the Borough exercises sufficient control over various terms and conditions of employment of the paid firemen to support a conclusion that the Borough is at least a joint employer of the paid firemen." The PLRB's decision was affirmed by this Court in the unreported decision of *Borough of Pottstown v. Pennsylvania Labor Relations Board,* (No. 389 C.D.1996, filed September 18, 1997), *petition for allowance of appeal denied,* 548 Pa. 620, 693 A.2d 590 (1997).

ted an unfair labor practice by disciplining and subsequently discharging Weidensaul. Pottstown and Philadelphia Volunteers filed exceptions to the hearing examiner's proposed decision and order.

The PLRB, in its final order, agreed with the hearing examiner that "the facts reveal that the discharge of Weidensaul was unlawfully motivated and the Borough, through its 'high ranking official' [Company Chief/Assistant Borough Fire Chief] Groff, played a leading role in that discharge and preceding discipline." While it found that Philadelphia Volunteers had committed an unfair labor practice, the PLRB held that it lacked any jurisdiction over the volunteer fire company because it was not an employer as defined by Act 111 [15]—i.e., political subdivisions of the Commonwealth are within that definition but not a nonprofit corporation such as the Philadelphia Volunteers. Nonetheless, because Groff was a "high ranking official" as an assistant borough fire chief, the PLRB imputed his conduct to Pottstown. The PLRB directed Pottstown to reinstate Weidensaul (1) to his former position with Philadelphia Volunteers or to a similar position with one of the other three volunteer fire companies in Pottstown or (2) to a position in Pottstown with equivalent salary and benefits and (3) pay him back pay from the date of his discharge until the present. This appeal followed.[16]

Pottstown contends, *inter alia*, that any anti-union animus instigated and carried out within the domain of the Philadelphia Volunteers cannot be imputed to it based upon the knowledge and conduct of a single individual who is designated as "volunteer fire company chief/assistant borough fire chief".[17] While no Pennsylvania cases have addressed whether the action of one employer forming the basis of an unfair labor practice can be

imputed to the other employer in a joint employer relationship, our courts have been guided by federal interpretations of provisions under the National Labor Relations Act, 29 U.S.C. §§ 151–169, that are similar to provisions under the PLRA. *See Pennsylvania Labor Relations Board v. Loose*, 402 Pa. 620, 168 A.2d 323 (1961). In *America's Best Quality Coatings Corporation (ABQC) v. National Labor Relations Board*, 44 F.3d 516 (7th Cir.), *cert. denied*, 515 U.S. 1158, 115 S.Ct. 2609, 132 L.Ed.2d 853 (1995) ABQC, a metal plating corporation, transferred its employees to the payroll of Staff Right, Inc., a temporary employment agency, due to economic hardship. During this time, ABQC engaged in various acts of intimidation to thwart unionization of its employees. The union filed an unfair labor practice charge against ABQC with the National Labor Relations Board (NLRB). Finding that Staff Right, Inc. was a joint employer, the NLRB agreed with the administrative law judge that it was not liable for any unfair labor practices because it neither knew nor should have known about ABQC's discriminatory conduct.

In affirming the NLRB's findings, the Seventh Circuit applied the joint employer liability standard set forth in *Capitol EMI Music, Inc.*, 311 N.L.R.B. 997, 1993 WL 195860 (1993), *enforced sub nom., Capitol EMI Music, Inc. v. NLRB*, 23 F.3d 399 (4th Cir.1994). In that case, the Fourth Circuit affirmed the NLRB, holding that:

> [I]n joint employer relationships ... we will find both joint employers liable for an unlawful employee termination (or other discriminatory discipline short of termination) only when the record permits an inference (1) that the nonacting joint employer knew or should have known that the other employer acted against the employee

---

15. Section 1 of Act 111 extends the right to bargain to "[p]olicemen or firemen employed by a political subdivision of the Commonwealth or by the Commonwealth ..." 43 P.S. § 217.1.

16. This Court's scope of review is limited to a determination of whether an error of law has been made, whether constitutional rights have been abridged, or whether the PLRB's findings of fact are supported by substantial evidence on the record. *Township of Upper Saucon v. Penn-*

*sylvania Labor Relations Board*, 152 Pa.Cmwlth. 530, 620 A.2d 71 (1993).

17. As an alternative, Pottstown argues that Weidensaul's discharge was not a pretext to terminate him because of his union activities, but was the result of several instances of misconduct during the course of his employment. However, because of the manner in which we resolve this case, we need not address that argument.

for unlawful reasons and (2) that the former has acquiesced in the unlawful action by failing to protest it or to exercise any contractual right it might possess to resist it ... The burden then shifts to the employer who seeks to escape liability for its joint employer's unlawfully motivated action to show that it neither knew nor should have known, of the reason for the other employer's action or that, if it knew, it took all measures within its powers to resist the unlawful action.

Adopting and applying that standard to this case, the sole reason that the PLRB found that Pottstown, as the nonacting joint employer, knew or should have known of the unfair labor practice was because Groff was an assistant borough fire chief and because of his knowledge and acquiescence when he was present at or involved in some of the discipline of Weidensaul. The PLRB stated:

[I]t is apparent that [Pottstown] has, through the provisions of its code, designated the assistant fire chief as an official responsible for the "superintendence and direction of the fire department." § 255. The [Pottstown] code also provides that the assistant fire chief shall serve as the chief of the individual fire company from which he was elected. § 258. At the [Philadelphia Volunteers], Groff held the dual position of Borough assistant fire chief and [company] chief at the time of Weidensaul's discharge and for the three years preceding it, during which time the events at issue occurred. Thus, under our plain reading of the borough code, Groff is both a *high ranking official* of the Borough and the [Philadelphia Volunteers] and is authorized to direct the operations of the fire department at the [Philadelphia Volunteers].

Because the PLRB imputed Groff's knowledge and acquiescence [18] to Pottstown only because of his designation as an assistant borough fire chief, that designation makes him a "high ranking official" of Pottstown. Whether his conduct can be imputed to Pottstown is determined by whether that characterization is correct.

At the very least, a person who is a "high public official" [19] must be considered a manager. In *City of Pittsburgh v. Pennsylvania Labor Relations Board*, 124 Pa.Cmwlth. 502, 556 A.2d 928, *appeal denied*, 522 Pa. 626, 564 A.2d 917 (1989), we addressed the standards that had to be met to be considered a manager within the context of fire department officers in a collective bargaining unit. In that case, the City of Pittsburgh filed a petition for unit clarification requesting the exclusion of captains, battalion chiefs and deputy chiefs in the Bureau of Fire from the collective bargaining unit. Upholding the hearing examiner's findings, the PLRB entered a final order of unit clarification concluding that the positions were non-managerial and should remain within the bargaining unit. In affirming the PLRB's findings, we applied the test set forth in *Fraternal Order of Police, Star Lodge No. 20 v. Pennsylvania Labor Relations Board*, 104 Pa.Cmwlth. 561, 522 A.2d 697 (1987), *aff'd*, 522 Pa. 149, 560 A.2d 145

---

18. The only conduct set forth to demonstrate Groff's knowledge and acquiescence is the following:

*February 2, 1995*
Pursuant to the January 17, 1995 posted memorandum, Groff was present at the Philadelphia Volunteers' meeting when the president expressed his feelings about Weidensaul's union activities and his involvement in the FLSA lawsuit.
*February 1995*
Groff contacted Weidensaul and another volunteer fire company operator to investigate the February 18, 1995 incident where Weidensaul failed to respond to the first call of a gas leak.
*May 26, 1995*
Groff contacted Weidensaul and several witnesses to investigate whether Weidensaul had

damaged a stop sign while trying to maneuver down a narrow street.
*February 12, 1996*
Groff was present at and participated in the special meeting held to discuss whether charges would be brought against Weidensaul for his theft caught on videotape. On this same day, he commented to Mrs. Weidensaul that "this is all because of what is going on", however, the Record is unclear as to the exact meaning of this comment.

19. The term "high public official" is a term of art used to determine whether a public official is absolutely immune from suit. In that context, a Pottstown assistant borough fire chief would not be one. *See Bass v. Cuyler*, 36 Pa.Cmwlth. 74, 387 A.2d 964 (1979); *Staley v. Commonwealth*, 33 Pa.Cmwlth. 22, 380 A.2d 515 (1977).

(1989) (*Star Lodge II*). In *Star Lodge II,* we concluded that a position is classified "as managerial when the named function is affirmatively among the powers of the position, and ... [classified] as merely supervisory when the function is absent from those powers[.]" 522 A.2d at 704, 522 A.2d 697. Powers sufficient to classify a position as managerial include:

- Policy Formulation—authority to initiate departmental policies, including the power to issue general directives and regulations;
- Policy Implementation—authority to develop and change programs of the department;
- Overall Personnel Administration Responsibility—as evidenced by effective involvement in hiring, serious disciplinary actions and dismissals;
- Budget Making—demonstrated effectiveness in the preparation of proposed budgets, as distinguished from merely making suggestions with respect to particular items;
- Purchasing Role—effective role in the purchasing process, as distinguished from merely making suggestions; [and]
- Independence in Public Relations—as evidenced by authority to commit department resources in dealing with public groups.

*Id.* We held that deputy chiefs, battalion chiefs and captains were not managerial employees because their primary duties were supervisory and operational in nature.

A review of Groff's duties as *assistant borough fire chief* reveals that he is not a manager of Pottstown. He has neither authority to formulate or implement policies on behalf of Pottstown, nor can he prepare a budget, purchase fire equipment or allocate resources to public groups on behalf of Pottstown. Under the Pottstown Code, he only has to report to the Borough Manager any violation of the Pottstown fire department's rules and/or regulations and to assume command at the scene of a fire when necessary. The deputy chiefs in *City of Pittsburgh* only had operational control for fighting fires and recommending discipline, and we have held both functions to be insufficient to character-

ize a deputy chief, a full-time employee of the city, as a manager, let alone a designated assistant borough fire chief, who is not elected by Pottstown but by the Philadelphia Volunteers.

Accordingly, because an assistant borough fire chief is not a "high ranking official" of Pottstown, his conduct and knowledge of the unfair labor practice against Weidensaul cannot be imputed to the borough and the final order of the PLRB is reversed.

## ORDER

AND NOW, this 1st day of April, 1998, the Final Order of the Pennsylvania Labor Relations Board, dated June 10, 1997, is reversed.