**LANCASTER COUNTY, Petitioner**

v.

**PENNSYLVANIA LABOR RELATIONS BOARD, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Oct. 9, 2013.
Decided Dec. 30, 2013.

Susan R. Friedman and Brad M. Kushner, Lancaster, for petitioner.

Warren R. Mowery, Jr., Harrisburg, for respondent.

Amy L. Rosenberger, Philadelphia, for intervenor AFSCME District Council 89.

BEFORE: PELLEGRINI, President Judge, and McGINLEY, Judge, and SIMPSON, Judge, and LEAVITT, Judge, and BROBSON, Judge, and McCULLOUGH, Judge, and COVEY, Judge.

OPINION BY Judge McCULLOUGH.

Lancaster County (County) petitions for review of the May 15, 2012 final order of

the Pennsylvania Labor Relations Board (PLRB) that dismissed the County's exceptions to the hearing examiner's decision and order, concluding that the County violated sections 1201(a)(1) and (3) of the Public Employe Relations Act (PERA)[1] in terminating the employment of Tommy Epps and Adam Medina in retaliation for their union activities. Among other things, the County contends on appeal that the evidence was legally insufficient to support a finding that it had knowledge of Epps' and Medina's union activities or that anti-union animus was the motivating factor in its decision to terminate their employment. We reverse.

### Facts and Procedural History

On October 7, 2010, the American Federation of State, County and Municipal Employees, District Council 89 (Union) filed a charge of unfair labor practices with the PLRB against County, alleging violations of sections 1201(a)(1) and (3) of PERA. A hearing ensued, at which the parties presented testimony and documentary evidence. The facts of this case, taken predominately from the hearing examiner's findings of fact and also uncontradicted evidence from the Union and the County, are as follows.

The County operates a Youth Intervention Center (Center) with a detention side for juveniles who have been adjudicated delinquent by a court and a shelter side for other juveniles. The juvenile residents on the detention side have been ordered there by a court for committing a variety of offenses, including theft, burglary, robbery, drug possession, assault, and motor vehicle theft. In the spring of 2010, the Union conducted an organizing drive to accrete into its existing prison guard unit the detention and security officers employed at the Center. (Findings of Fact (F.F.) Nos. 3–5.)

Medina worked in the detention side of the Center, on the third shift, from 11:00 p.m. to 7:00 a.m. Medina was involved in the Union's organizing effort, attending the Union meetings, recruiting other employees to attend meetings, and reporting back to third shift staff members. In May 2010, Medina told his supervisor, Fred Arnold, about his support for the Union. (F.F. Nos. 27, 39.) Specifically, Medina testified that he asked Arnold "what [Arnold] thought about the Union" and also what Arnold thought about what "[Medina] was doing about the Union[.]" (F.F. No. 39; N.T. at 61.)

Epps also worked in the detention side of the Center, on the second shift, from 7:00 a.m. to 3:00 p.m. (F.F. No. 28.) Epps was involved in the Union's organizing effort, talking to staff about how the Union could benefit them. Epps told his supervisor, William Delgado, that "the Union [was] coming" and that he had "talked to the Union representatives." (F.F. Nos. 28, 40; N.T. at 104.) On June 10, 2010,

---

1. Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. § 1101.1201(a)(1), (3). Sections 1201(a)(1) and (3) of the PERA provide:

(a) Public employers, their agents or representatives are prohibited from:

(1) Interfering, restraining or coercing employes in the exercise of the rights guaranteed in Article IV of this act.

\* \* \*

(3) Discriminating in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any employe organization. 43 P.S. § 1101.1201(a)(1), (3).

the Union filed a petition for representation with the PLRB. (F.F. No. 6.)

Evette Sepulveda works in the shelter side of the Center on the third shift. On June 20, 2010, Sepulveda complained to her supervisor, Christina Delgado (William Delgado's wife), that someone was taking snacks from her workplace mailbox. At the Center, each employee has an open mailbox with his or her name under it. Sepulveda said that items had been taken over the previous month, but the most recent time was Thursday or Friday. (F.F. Nos. 7–9, 12, 41.)

Christine Delgado initiated an investigation and reviewed surveillance video of the mailbox area with Arnold, the third shift detention supervisor. The video from Wednesday, June 16, and Thursday, June 17, shows three employees taking something out of Sepulveda's mailbox. Two of the employees were Medina and Epps, and the third was Latoya Boddy, a part-time employee. The video shows Medina taking a snack-size bag of chips, approximately six inches in size. The video also shows Epps taking a similar sized bag of cookies. (F.F. Nos. 13–14, 24, 41.)

Christina Delgado reported her video observations to the Center's Director, Drew Fredericks. In an e-mail dated June 21, 2010, Christina Delgado informed Fredericks that an examination of the surveillance video showed that Medina and Epps took snacks from Sepulveda's mailbox. At the end of the e-mail, Christina Delgado stated: "I don't know if there is anything we can do about this but I wanted to make you aware that this was going on." (County Ex. 1.)

On Monday, June 21, 2010, Fredericks called Sepulveda and asked her if she had given anyone permission to take snacks from her mailbox. Sepulveda stated that she only gave permission to Lavon Jackson and Damaris Veley. Fredericks instructed Sepulveda to write an unusual incident report. In her ensuing report, Sepulveda confirmed that only Jackson and Veley had permission to take snacks from her mailbox. (F.F. No. 15.)

Fredericks then reviewed the videotape and met with Medina and Epps. After Fredericks showed the videotape to Medina and Epps, Medina admitted that he had taken snacks from Sepulveda's mailbox. Epps admitted that he, too, had taken snacks out of Sepulveda's mailbox. However, Epps stated that he believed the snacks belonged to another employee, Leroy Kirkland, and that he thought Kirkland had given him permission to take the snacks. On June 21, 2010, Fredericks asked Sepulveda, Medina, and Epps to write reports about the incidents on June 16 and 17. (F.F. Nos. 16–17.)

In response, Medina wrote a report admitting that he removed a snack size bag of chips from Sepulveda's mailbox on June 16, but claimed that approximately one year ago, Sepulveda had given him permission to take food items from her mailbox. Epps also wrote a report, admitting that he took a snack bag of cookies from Kirkland's mailbox, who Epps believed had given him permission to take snacks from his mailbox. (F.F. Nos. 18–19.) After being contacted by Medina, Sepulveda issued her report, which stated:

> On Monday, June 21, 2010, at about maybe 2:00 pm, I received a call from my co-worker, Adam Medina. [H]e asked me if I had said anything to my supervisor about missing food from my mailbox. I said, "Yes, why." Adam went on to tell me that he took chips from my mailbox and that he was sorry but he thought he could because of a conversation he said we had about 1 year ago. **I told Adam I didn't remember but that he should have told me** because I really wouldn't care if he

wanted chips because I knew him and it wouldn't be a big deal. I told Adam this has been going on for a while, the missing food from my mailbox, Adam said that it had only been one or two times that he took chips from my mailbox. **I then told Adam again that he should have told me he wanted them before taking it** since I have been missing food.... I also told Adam if I would have known it was him, I wouldn't even care....

(F.F. No. 20; Union Ex. U–6) (emphasis added).

Fredericks also contacted Kirkland, and he submitted a written report stating that he authorized only two people to take items from his mailbox—Boddy and "Eva." (County Ex. C–21.) Following the reports, no one from the County asked Sepulveda if she specifically gave Medina permission to take snacks from her mailbox. (F.F. No. 21.)

Fredericks believed that termination was warranted, and he consulted with Andrea McCue, the County Human Resources Director, about the incidents and the appropriate discipline. The County's Center has a progressive discipline policy. The first step is corrective counseling; the second step is a verbal warning; the third step is a written warning; the fourth step is a one-day suspension; the fifth step is a three-day suspension; the sixth step is a five-day suspension; and the seventh step is termination. (F.F. Nos. 30, 32.) The progressive discipline policy also states that "[t]here are, however, violations of the rules or laws so severe as to render warning or progressive discipline futile. Immediate suspension or discharge is appropriate in these cases." (F.F. No. 31.) McCue concurred with Fredericks that termination was warranted from a human resources perspective. In making this determination, she relied on the County's

"Guidelines for Determining Unacceptable Behavior," which included "theft or damage/destruction of County or co-worker property" as one of 16 incidents of unacceptable behavior that could lead to disciplinary action under the County's disciplinary policy. (F.F. No. 33; N.T. at 241.)

On June 23, 2010, Fredericks issued notices to Medina, Epps, and Boddy, informing them that he was recommending that they be terminated immediately for taking items from Sepulveda's mailbox. (F.F. No. 22.) Each notice stated: "[T]he shear [sic] theft of another employee's personal property demonstrated this individual's total failure to achieve the basic expectations of a [Center] and County employee." (F.F. No. 23.) Fredericks believed that the taking of snacks, standing alone, was serious enough to justify immediate termination rather than progressive discipline because of the need for a youth care worker to be a "positive role model" for the juvenile residents of the Center. (F.F. No. 34.) As Fredericks explained:

> [Fredericks]: Again, we work with residents that are detained, some of them, for theft charges, and we expect our staff members to come and be a role model for these residents.
>
> It would be unacceptable and unprofessional to actually have people go on break and steal things from other employees and then go back in the unit and work with these residents and counsel these residents on some of their issues, you know, when some of them are— they're in there for theft.

(N.T. at 212–13.)

Medina's prior record contained two written reprimands, one for leaving a resident unattended and the other for failing to pay a five dollar fee to participate in a dress down day at work. Epps' prior record, accumulated over ten and one-half years of employment with the County, con-

sisted of over twenty incidents, including at least one suspension. Fredericks reviewed Medina's prior disciplinary record before issuing the termination notice, but he did not consider it as a basis for his decision. Fredericks did not review Epps' disciplinary history prior to issuing the termination notice, stating that it had no bearing on his decision. Neither Medina nor Epps had been disciplined for theft before the mailbox incidents, and the County has never fired anyone else for taking something from an employee's mailbox. Prior to the incidents with Medina and Epps, Fredericks had received complaints from employees that personal items had been taken from their mailboxes, including a cell phone, but he did not investigate any of these allegations because no written complaints were filed by the employees or the employees never provided their supervisors with a specific timeframe in which the items were stolen. (F.F. Nos. 11, 29, 35–37; N.T. at 34–37, 43.) Fredericks stated that without a specific time-frame, the County would have to "pursue video for days on end," which is something that he believed was not feasible. (N.T. at 36.)

On June 24, 2010, the day *after* Medina was terminated, a co-worker, Allison Buckwalter, informed Fredericks that she was present during a phone call between Medina and Sepulveda and "understood" from Medina's "side of the conversation" that Medina had permission from Sepulveda to take snacks from her mailbox. (Union Ex. 7.) Buckwalter stated that she could "only give . . . a general time that this conversation took place," namely when Medina was on "light duty" status working with her. *Id.* Significantly, Buckwalter was "not able to say whether [Sepulveda's] permission was for any time or just that day." *Id.* However, Buckwalter "would be willing to say that . . . it is very possible that [Sepulveda] does not remember saying any-

thing." Buckwalter told Fredericks that she was "pretty sure" Medina was going to file an appeal, and asked him if he would like her to file a written report. Fredericks responded that the County "already [had] all of the documentation from all individuals involved." *Id.*

Thereafter, Medina and Epps went through a grievance and appeals procedure for employees who are not covered by collective bargaining agreements. The first step in the grievance process occurred before the immediate supervisor; the second step was an appeal to Fredericks; the third step was an appeal and hearing before McCue; and the final step was an appeal to a panel of County officials from other departments. (F.F. Nos. 43–45.) During the grievance process, Medina and Epps were provided with the opportunity to present evidence and make arguments as to what they thought was the appropriate level of discipline. (County Ex. C–3–C–7, C–10–C–14.) The other discharged employee, Boddy, did not appeal her termination because she was a part-time employee and the grievance appeal procedure does not cover part-time employees. Ultimately, Medina's and Epps' appeals were denied and they were terminated from their employment with the County. (F.F. Nos. 43–45.)

Based upon his factual findings and apparent credibility determinations, the hearing examiner determined that the County violated section 1201(a)(3). The hearing examiner stated that to prevail on such a charge, it was the Union's burden to prove three elements: (1) Medina and Epps were engaged in protected activity; (2) the County was aware of the protected activity; and (3) the adverse employment action, termination, would not have occurred but for the protected activity. (Hearing Examiner's Proposed Decision and Order (PDO) at 6.)

The hearing examiner found that the Union proved the first element because Medina and Epps were involved in the Union's organizing efforts, particularly by attending the Union meetings and advocating that other employees support the Union. Next, the hearing examiner determined that the Union proved that the County had knowledge of the protected activity on the basis that Medina and Epps told their supervisors (Arnold and William Delgado, respectively) about their support for the Union and the supervisors' knowledge can be mechanically imputed to the County. Finally, with regard to the third element, the hearing examiner concluded that the Union established that the County was motivated by anti-union animus in discharging Medina and Epps. In so concluding, the hearing examiner relied upon three factors. First, the hearing examiner found that the timing of the termination was suspicious because Medina and Epps communicated with their supervisors regarding the Union; the Union then filed a petition for representation on June 10, 2010; and Medina and Epps were discharged shortly thereafter on June 23, 2010. Second, the hearing examiner found that the County "chose to ignore its progressive discipline policy," and Medina and Epps were subjected to disparate treatment in that Epps had a disciplinary record that was worse than Medina's but they both suffered the same consequence of termination. And third, the hearing examiner found that the County failed to provide an adequate explanation for the terminations. (PDO at 7–9.)

In discussing what he perceived to be the County's inadequate explanation for the terminations, the hearing examiner found it significant that the County did not utilize surveillance videotape to investigate other allegations of theft, and that Christina Delgado and Fredericks reviewed surveillance video before receiving Sepulveda's written incident report. The hearing examiner further stressed that no one from the County talked directly with Sepulveda following her second report in which she said that she would not mind if Medina took snacks, and also that this was the first time the County had ever terminated an employee for taking items from another employee's mailbox. Finally, the hearing examiner opined that taking small bags of snacks does not seem to be "so severe as to render warning or progressive discipline futile," and believed that the "County could fulfill its mission of operating a juvenile detention facility with high standards of employee behavior without imposing the most severe discipline possible ... for taking small bags of snacks." (PDO at 7–10.) Accordingly, the hearing examiner concluded that the County's decision to terminate Medina and Epps was motivated by anti-union animus. (PDO at 11.)

Furthermore, the hearing examiner concluded that the County violated section 1201(a)(1) because the County's conduct had a "tendency to coerce" employees from exercising their rights under PERA. (PDO at 11.) The hearing examiner found that, based on the totality of the circumstances, "a reasonable employee [would] conclude that the County's approach to these incidents was more a reaction to the employee's exercise of protected activity than an application of work rules to correct employee behavior." (PDO at 11.)

The County filed exceptions with the PLRB, which issued a final order on May 15, 2012, dismissing the County's exceptions and making the hearing examiner's proposed decision and order final. Regarding the County's exception that the Union failed to prove that the County had knowledge of the employees' union activities, the PLRB stated:

[T]he [PLRB] has held that a supervisor's knowledge of protected activity may be imputed to the employer. *Bensalem Township*, 19 PPER ¶ 19010 (Final Order, 1987); *PPSU, Local 668 v. Lancaster County*, 24 PPER ¶ 24027 (Final Order, 1993). The fact that Arnold and William Delgado were not managers does not preclude a finding that the employer had knowledge of [the Union's] 2010 organizing drive and the protected activities of Medina and Epps. Here, Arnold was Medina's supervisor and was aware of Medina's protected activities. Epps' supervisor, William Delgado, was aware of Epps' protected activities. Arnold and William Delgado's wife, Christina [Delgado], were the ones that investigated Sepulveda's complaint. Accordingly, the record supports the employer's knowledge of the protected activities for purposes of section 1201(a)(3) of PERA.

(PLRB's Final Order at 4.)

In terms of the County's exception that the Union failed to establish that County was motivated by anti-union animus in terminating Medina and Epps, the PLRB rejected this contention, reasoning as follows:

As the Hearing Examiner noted, the timing of the County's firing of Medina and Epps is suggestive of anti-union animus. A Petition for Representation was filed by [the Union] on June 10, 2010, and less than two weeks later, on June 23, 2010, Medina and Epps were terminated from employment.

However, timing alone may not support an inference of anti-union animus. Nevertheless, timing coupled with pretextual reasons for the employer's action will support the finding of a discriminatory motive. *International Union of Operating Engineers, Local 66 v. Connoquenessing Township*, 41 PPER ¶ 47 (Final Order, 2010); *Somerset Area Education Association v. Somerset Area School District*, 37 PPER ¶ 1 (Final Order, 2005). Pretext arises where the Hearing Examiner finds, based on the credible evidence of testimony of record, that the employer would not have taken the same action against the employee in the absence of the protected activity. *Lehighton Area School District v. PLRB*, 682 A.2d 439 (Pa.Cmwlth.1996)....

The Hearing Examiner expressly found that "[a]bsent the protected activity of Medina and Epps, County would not have terminated their employment." (PDO at 11). Upon review of the record, there are no compelling reasons warranting reversal of the Hearing Examiner's credibility determinations....

The Hearing Examiner adequately explained his reasons for rejecting the County's claim that it would have terminated the employment of Medina and Epps regardless of their protected activity. For example, the Hearing Examiner noted that despite Sepulveda's claim that items have been missing from her mailbox for weeks or months, the County limited its review of the videotape to only two days. Further, the Hearing Examiner noted that the County disregarded Sepulveda's subsequent incident report indicating that she did not care if Medina took snacks from her mailbox. The Hearing Examiner also noted that the County did not investigate other incidents of alleged thefts, including one involving a missing cell phone. Nor did the County explore lesser discipline under its progressive discipline policy for Medina and Epps.

Moreover, in addition to those reasons set forth by the Hearing Examiner, we note that other record evidence also supports the rejection of the County's claim that it would have terminated the em-

ployment of Medina and Epps in the absence of protected activity. First, Christina Delgado, Sepulveda's supervisor, emailed Fredericks about the incident and indicated that she was unsure whether any discipline was even warranted. (County Ex. 1.) Thus, the record evidence indicates that at least one supervisor at the [Center] did not believe termination of employment was the only discipline that could be meted out for the actions of Medina and Epps. Further, the County ... dismissed out-of-hand Medina's assertion that he had permission from Sepulveda to take snacks from her mailbox, and would not even consider an email from a co-worker independently corroborating Medina's claim. (Union Ex. 7.) In addition, the County asserts that in the absence of any employee wanting to pursue the matter, the County will not investigate an alleged theft. However, if taking a small bag of chips that had been left for another co-worker is such egregious conduct warranting immediate dismissal, then, if [Center] employees are to be held to the high standards of role models for delinquent youth, why did the County fail to investigate when it became aware of the theft of an employee's cell phone? Furthermore, if an investigation of a theft is contingent on a victim's desire to pursue the matter, then why did not the County not at least follow up with Sepulveda after her subsequent incident report suggesting that she would not have reported the missing snacks if she had known it was Medina? On this record, there are no compelling reasons warranting reversal of the Hearing Examiner's finding that the County would not have terminated Med-ina and Epps' employment in the absence of protected activity.

(PLRB's Final Order at 5–6, some citations omitted.)

Based upon this rationale, the PLRB dismissed the County's exceptions, concluding that the hearing examiner did not err in determining that the County violated sections 1201(a)(1) and (3) of PERA. The PLRB reasoned that because the hearing examiner properly found that the County's actions contravened section 1201(a)(3), "a derivative violation of section 1201(a)(1)," it need not address whether the County interfered with Medina's and Epps' protected rights under section 1201(a)(1) of PERA. (PLRB's Final Order at 6 and n.6.)

■ On appeal,[2] the County asserts that the PLRB erred in concluding that substantial evidence exists to establish that County knew of Medina's and Epps' union activities. For support, the County contends that Medina and Epps only discussed their union activities with their immediate supervisors, Arnold and William Delgado, both of whom were not involved in the decision to terminate their employment. The County maintains that the PLRB's mechanical imputation of these supervisors' knowledge to the decision-maker in this case, Fredericks, was an error of law because it effectively negates the requirement that the party alleging retaliation prove the employer's knowledge of union activity.

In addition, the County posits that the PLRB erred in concluding that the record contains substantial evidence to sustain an inference of anti-union animus. The County emphasizes that the evidence against it

---

**2.** Our scope of review of a PLRB order is limited to determining whether there has been a constitutional violation or an error of law and whether the necessary findings are supported by substantial evidence. *City of Reading v. Pennsylvania Labor Relations Board,* 130 Pa.Cmwlth. 397, 568 A.2d 715, 718 (1989).

in support of anti-union animus consists of weak, circumstantial evidence, and argues that the PLRB's criticism as to the manner in which it investigated and disciplined Medina and Epps is contradicted by the record and/or does not constitute affirmative evidence of anti-union animus. Further, the County argues that the PLRB improperly viewed the timing of the terminations as a strong indication of an anti-union motive because Medina and Epps were terminated shortly after they committed misconduct and this misconduct superseded, or, at least undermined, the causal connection with prior union activity.

Upon review, we find merit in both of the County's assertions of error.

### Discussion

■ It is well-settled that the party claiming that an unfair labor practice has been committed has the burden of proving that charge. *Perry County v. Pennsylvania Labor Relations Board*, 160 Pa. Cmwlth. 287, 634 A.2d 808, 810–11 (1993). Section 1201(a)(3) of PERA provides that "[p]ublic employers, their agents or representatives are prohibited from ... [d]iscriminating in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any employe organization."

■ To establish an unfair labor practice under section 1201(a)(3) of PERA, it must be proved, by a preponderance of the evidence, that: (1) the employee was engaged in protected activity; (2) the employer knew of the activity; and (3) the employer was motivated by anti-union animus in taking adverse action. *St. Joseph's Hospital v. Pennsylvania Labor Relations Board*, 473 Pa. 101, 373 A.2d 1069 (1977); *Case v. Hazleton Area School District*, 915 A.2d 1262, 1267 (Pa.Cmwlth.2007). If an employee makes this showing, the burden then shifts to the employer to establish by

a preponderance of the evidence that the employee would have been discharged even in the absence of his union activities. *Lehighton Area School District*, 682 A.2d at 442.

■ In reviewing a PLRB determination under PERA, this Court has recognized that the PLRB possesses administrative expertise in the area of public employee labor relations and should be shown deference, and we will not lightly substitute our judgment for that of the PLRB. *Id.* It is within the province of the PLRB to weigh conflicting evidence, make appropriate credibility determinations, resolve primary issues of fact, and draw reasonable inferences from the established facts and circumstances. *Id.* This Court must uphold the PLRB's decision if its factual findings are supported by substantial evidence, and if the conclusions of law drawn from those facts are reasonable. *Allegheny County Deputy Sheriffs' Association v. Pennsylvania Labor Relations Board*, 615 Pa. 126, 131, 41 A.3d 839, 843 (2012).

■ "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Delaware County Lodge No. 27, Fraternal Order of Police v. Pennsylvania Labor Relations Board*, 694 A.2d 1142, 1145 n. 5 (Pa.Cmwlth.1997). However, evidence proving "suspicion and conjecture" does not constitute substantial evidence as a matter of law. *Pennsylvania State Troopers Association v. Pennsylvania Labor Relations Board*, 39 A.3d 616, 623 (Pa.Cmwlth.2012). Stated differently, "[s]ubstantial evidence is more than a mere scintilla and must do more than create a suspicion of the existence of the fact to be established." *Shive v. Bellefonte Area Board of School Directors*, 12 Pa. Cmwlth. 543, 317 A.2d 311, 313 (1974). The record as a whole, including the evidence adduced by an employer, may be

considered when determining whether there is substantial evidence[3] to support a finding that the employer had knowledge of union activity and/or that the employer was motivated by anti-union animus. *See Lehighton Area School District*, 682 A.2d at 442–43.

The most "basic element of an unlawful discharge" claim is that the employer was aware of the discharged employee's protected activities because it is a "fundamental prerequisite in establishing a discriminatory motivation." *Goldtex, Inc. v. National Labor Relations Board*, 14 F.3d 1008, 1011 (4th Cir.1994). *See Chauffeurs, Local 633 v. National Labor Relations Board*, 509 F.2d 490, 496 n. 27 (D.C.Cir.1974) ("We have, of course, no dispute with the proposition that the employer must be aware of the employee's union activities in order to discharge that employee on the basis of those activities."). Although our Supreme Court and this Court have held that an employer is vicariously liable for a supervisor's unfair labor practices for purposes of PERA, *Pennsylvania Labor Relations Board v. Cadman*, 370 Pa. 1, 3–4, 87 A.2d 643, 645 (1952); *Perry County*, 634 A.2d at 811, it appears that no binding Pennsylvania decision has ever addressed the issue of whether a supervisor's knowledge that an employee is engaged in pro-union activity can be automatically imputed to the employer.[4] Absent such authority, this Court may rely upon federal case law interpreting section 8(a)(3) of the National Labor Relations Act (NLRA)[5] as persuasive authority. *Cadman*, 370 Pa. at 3, 87 A.2d at 644; *Borough of Pottstown v. Pennsylvania Labor Relations Board*, 710 A.2d 641, 646 (Pa. Cmwlth.1998).

3. We note that "substantial evidence" is the appellate standard of review for determining whether there is sufficient evidence to support a finding of fact, while, on the other hand, "preponderance of the evidence" is the standard to be applied by the fact-finder to determine whether the burden of proof has been met. *Samuel J. Lansberry, Inc. v. Pennsylvania Public Utility Commission*, 134 Pa. Cmwlth. 218, 578 A.2d 600, 601 (1990). More precisely, substantial evidence is "the relevant evidence that a reasonable mind, without weighing the evidence or substituting its judgment for that of the fact finder, might accept as adequate to support the conclusion reached." *Gallo v. Workmen's Compensation Appeal Board (United Parcel Service)*, 95 Pa. Cmwlth. 158, 504 A.2d 985, 988 n.1 (1986). Conversely, a preponderance of the evidence standard concerns the weighing of the evidence and has been described as evidence that is weighty enough to tip the scale in favor of a burdened party: "Since proof by 'a preponderance of the evidence' is the lowest degree of proof recognized in the administration of justice, the *evidence* the burdened party offers does not become *proof* until it *preponderates* in evidentiary weight against the opposing evidence." *Se–Ling Hosiery v. Margulies*, 364 Pa. 45, 48–49, 70 A.2d 854, 856 (1950) (emphasis in original).

4. The parties direct our attention to *Borough of Pottstown v. Pennsylvania Labor Relations Board*, 710 A.2d 641 (Pa.Cmwlth.1998). In that case, this Court surveyed and adopted federal case law to set forth the standard for imposing joint employer liability for unfair labor practices. In doing so, we assessed the situation where an employee is involved in a joint employer relationship and determined that the unfair labor practice of one employer can be imputed to the other employer when the other employer knew or should have known that the employee was discharged for unlawful reasons and acquiesced in the unlawful action. *Id.* at 646–47. Because the test adopted in *Borough of Pottstown* provides an unworkable standard for determining imputation in the single employer context, we conclude that *Borough of Pottstown* does not provide guidance in addressing the issue at hand.

5. Nearly identical to section 1201(a)(3) of PERA, section 8(a)(3) of the NLRA states that it is an unfair labor practice for an employer, or a person acting as an agent, "to discriminate in regard to hire or tenure of employment or any term or condition of employment. . . ." 29 U.S.C. § 158(a)(3).

In *Vulcan Basement Waterproofing v. National Labor Relations Board*, 219 F.3d 677 (7th Cir.2000), the United States Court of Appeals for the Seventh Circuit explained why knowledge cannot be imputed as a matter of course:

> [R]egarding imputation, courts have generally rejected . . . attempts to simply attribute a foreman or supervisor's knowledge of an employee's union activities to the company. Automatically imputing such knowledge to a company improperly removes the . . . burden of proving knowledge. We have rejected other attempts . . . to so lighten [the] burden of proof. And we reject any attempt to do so here: [the employer] or its decision-maker . . . did not know of [the employee's] union activities just because [the supervisor] knew about them.

*Id.* at 685–86 (footnotes and citations omitted). The United States Court of Appeals for the Eleventh and Fifth Circuits also adhere to this view. *Jim Walter Resources, Inc. v. National Labor Relations Board*, 177 F.3d 961, 963 (11 th Cir.1999) ("[T]he Board may not impute the knowledge of a low-level supervisor to a decision-making supervisor."); *Pioneer Natural Gas Co. v. National Labor Relations Board*, 662 F.2d 408, 412 (5th Cir.1981) ("In establishing the knowledge element, the Board may not simply 'impute' the knowledge of a lower-level supervisor to the decision-making supervisor.").

In *Pioneer Natural Gas Co.*, two supervisors discovered in May 1978 that three employees attended a union meeting and distributed union cards to other employees. In June 1978, the employees were reprimanded for harassing co-workers and making deliberate mistakes on the job. The administrative law judge (ALJ) and the NLRB determined that the employees' union activities were the motiving factor for the reprimand. On appeal, the court first explained that the undisputed evidence showed that the supervisors did not make the decision to reprimand the employees; instead, this decision was made by the assistant director and director. Noting that neither the ALJ nor the NLRB found that the directors were aware of the employees' union activities or that the supervisors communicated their knowledge to the directors, the court concluded that the ALJ committed an error of law by automatically imputing the supervisors' knowledge of the employees' union activities to the decision-making directors. In addition, the court concluded that the circumstances surrounding the reprimand were insufficient to sustain the inference that the directors knew of the employees' union activities. Upon its review of the record, the court found that there was no evidence that the supervisors, after discovering the employees' support for the union, participated in any way to issue the reprimand or communicated their knowledge to the directors. Accordingly, the court declined to enforce the NLRB's order finding an unfair labor practice.

Similarly, the hearing examiner and the PLRB in this case concluded that the County had knowledge of Medina's and Epps' union activities based solely upon a legal theory that mechanically imputed Arnold's and William Delgado's knowledge (even as limited as that was based on scant evidence in the record) of these activities to Fredericks. However, we conclude that this was an error of law because such a rule relieves the party alleging the unfair labor practice of the burden to prove, as a logical prerequisite and essential element of its claim, that the employer's decision-maker had knowledge of the employee's protected activity. Instead, we are persuaded by the reasoning of the above case law and adopt it for purposes of PERA. Therefore, while it is permissible to "rely

on circumstantial evidence to infer that the knowledge of one supervisor has been communicated to the other," the PLRB is not permitted to "mechanically impute" the knowledge of a lower-level supervisor to the decision-making supervisor. *Pioneer Natural Gas Co.*, 662 F.2d at 412.[6]

Moreover, the hearing examiner's findings of fact and the evidence of record conclusively establish that Fredericks, not Arnold or William Delgado, was vested with the authority and discretion to take disciplinary measures, and after consulting with McCue, he was the one who decided to terminate Medina and Epps. As in *Pioneer Natural Gas Co.*, there is no evidence that Arnold or William Delgado recommended that Medina or Epps be disciplined or otherwise participated in the decision-making process. Although Arnold reviewed the surveillance videotape with Christina Delgado, she, alone, reported her observations to Fredericks, and Fredericks independently reviewed the videotape. More significantly, the only evidence pertaining to knowledge demonstrated that Medina and Epps vaguely told their supervisors about their involvement with the Union in a setting that could only suggest that the conversations were casual. (N.T. at 61, 104.) The record is devoid of any evidence of a conversation between Arnold or William Delgado and Christine Delgado or Fredericks conveying the limited information that Arnold and William Delgado had. On this record, inference would have to be stacked upon inference, to the point of pure speculation, to arrive at a finding that Fredericks knew of Medina's and Epps' union activities. That is, it would have to be assumed, without any supporting evidence whatsoever, that both William Delgado and Arnold told Christina Delgado about the union involvement *and* Christina Delgado informed Fredericks.

There is no evidence in this case of antiunion sentiment, past or present, by any of the supervisors or Fredericks. Nor does the record contain any evidence to suggest that Medina and Epps were so open or notorious when performing their union activities that it could be inferred that Fredericks observed them first-hand or had reason to know about them. The record is also devoid of any evidence pertaining to the standard communication practice and/or reporting duties between William Delgado, Christina Delgado, Arnold, and Fredericks, such that it could reasonably be inferred that the Delgados or Arnold told Fredericks of Medina's and Epps' union activity. Although there may be instances where an employer's reason for discharging an employee has absolutely no basis in fact such that the only reasonable inference would be that the employee was terminated due to protected activity, this is not that case.

---

**6.** While recognizing that there is no binding Pennsylvania decision on the issue of imputed knowledge, the dissent states: "I cannot agree with the Majority's conclusion that a union must prove that one supervisor with knowledge of an employee's union activity told a higher level supervisor of the activity in order to establish that the employer was aware of the employee's union activities." (Dissenting op. at 1119.)

However, we are not announcing a rule of law mandating that in every case a supervisor must inform someone higher up in the chain about an employee's union activities in order to establish knowledge. Instead, we are adopting a rule of law that requires a union to demonstrate that the *decision-making* supervisor or other official had knowledge of the union activities. While this burden may be shown inferentially, through an array of circumstances, it cannot, as the dissent advocates, be met by mechanically imputing the knowledge of one individual to another. Every United States Court of Appeals to have addressed this issue has so held, and we are unable to locate any case law that holds to the contrary.

In *Shive*, the superintendent of a high school hired a teacher despite an unfavorable recommendation. The superintendent discussed the teacher's credentials to the school board but no action was taken at that time. Shortly thereafter, the teachers went on strike and a local newspaper displayed a photograph of the teacher on picket duty, carrying a sign that read "No contract—No work." *Id.* at 312. At the next meeting, the school board requested the superintendent to contact the person who made the unfavorable recommendation, and the superintendent confirmed that the recommendation was not favorable. During the next regular meeting of the school board, the superintendent nonetheless recommended the teacher for the position, but the school board took no action and the teacher was not employed. The superintendent informed the teacher that her services were terminated.

The teacher then filed a claim for unfair labor practices, and the PLRB upheld the charges. On appeal, this Court concluded that the PLRB's finding that the school board knew of the teacher's union activities "was based on suspicion and conjecture rather than substantive proof." *Id.* at 313–14. We reasoned:

> We cannot accept the [PLRB's] premise that a photograph appearing in a local newspaper, showing [the teacher] on picket duty carrying a sign reading "no contract—no work," was the sole motivation for the [s]chool [b]oard's examination of the unfavorable report of credentials … or that it accounted for the [s]chool [b]oard's unwillingness to hire [the teacher]. We could hardly agree with such a position without any testimony indicating knowledge of the photograph in question by the [s]chool [b]oard or the members of its employment committee or that they knew or recognized that [the teacher] was the person shown in the photograph as the sign carrier.

> The record is totally silent as to whether any member of the [s]chool [b]oard was personally acquainted with [teacher] or was aware of her participation on the picket line.

*Id.* at 314.

Similarly, here, based on our review of the record, we can only conclude that the evidence was substantially insufficient to sustain the inference that Fredericks had knowledge of Medina's and Epps' union activities. Therefore, because the Union failed to adduce substantial evidence to support a finding that the County had knowledge of protected activity, we conclude that the PLRB erred in upholding the unfair labor charge under section 1201(a)(3).

Notwithstanding, even if there were substantial evidence to prove that Fredericks had knowledge of Medina's and Epps' union activities, the record does not support a finding that Fredericks' decision to terminate their employment was motivated by anti-union animus.

When distilled to its essential analysis, the PLRB's decision concludes that the Union established anti-union animus based upon two factors: (1) the County's reasons for terminating Medina and Epps were pretextual; and (2) the timing of the discharges was suggestive of an anti-union motive.

With respect to the first factor, the PLRB concluded that "[p]retext arises where the hearing examiner finds, based on the credible evidence and testimony of record, that the employer would not have taken the same action against the employe in the absence of protected activity." (PLRB's Final Order at 4.) The PLRB then concluded that this standard was met, finding that "there are no compelling reasons warranting reversal of the hearing examiner's credibility determination." *Id.*

at 4–5. This was an incorrect statement and application of the law.

▮▮▮▮ If evidence of pretext is to have the probative force necessary to be indicative of anti-union animus, it must be affirmative, substantial evidence of pretext rather than mere suspicion and conjecture or a simple credibility determination adverse to the employer. Examples of evidence sufficient to establish a finding of "pretext" include the situation where the evidence affirmatively shows that: (1) the employer failed to investigate the conduct alleged as the basis for the employee's discipline, *see National Labor Relations Board v. Esco Elevators, Inc.*, 736 F.2d 295, 299 and n. 5 (5th Cir.1984) ("[The employer] failed to obtain [the pro-union employee's] version of the fight before deciding that he was the unjustified aggressor."); [7] and (2) the employer engaged in disparate treatment by disciplining the employee in a manner that differs from other employees that engaged in substantially similar conduct or the employer imposed discipline that deviates from the employer's past disciplinary practice, *see Marshall Durbin Poultry Co. v. National Labor Relations Board*, 39 F.3d 1312, 1321 (5th Cir.1994) ("Evidence at the hearing revealed that, unlike [the pro-union employee], four other employees had received three disciplinary write-ups within a twelve month period without being discharged.").[8] In these situations, the employer's stated business reasons for the discipline were undermined by substantial evidence tending to show that the reasons were in fact pretextual, thus suggesting that the employer had another motive (*i.e.*, anti-union animus) for disciplining the employee.

Our case law illustrates the above principles. In *Pennsylvania Labor Relations Board v. Stairways, Inc.*, 56 Pa.Cmwlth. 462, 425 A.2d 1172 (1981), the employer argued that the employee was discharged because he failed to pass certain employee evaluations rather than as the result of anti-union animus. This Court found that substantial evidence of pretext existed where the evidence established that the employer's evaluation and scoring methods were completely subjective; the pro-union employee received his first low score one month after his union activities began; the PLRB converted the pro-union employee's raw scores to percentage ratings, which demonstrated that his performance had not diminished substantially from his original evaluations; and the evaluation of another employee had been modified by her supervisor to prevent that employee from being placed on probation. Therefore, pretext arose where the evidence showed that the work performance of the pro-union employee was evaluated differently from another employee and the pro-union employee's work performance, as a matter of fact, did not decline as the subjective test scores indicated. We concluded in *Stairways, Inc.* that this evidence of pretext, coupled with the employer's threat to employees that they may lose their jobs for engaging in union activities, was evidence sufficient to sustain an inference of anti-union animus.

In *City of Reading v. Pennsylvania Labor Relations Board*, 130 Pa.Cmwlth. 397, 568 A.2d 715 (1989), the employer contended that the employee was terminated after it discovered that he was intoxicated at work. Initially, this Court recounted the hearing examiner's determination that the employer conducted an inadequate "investigation" because the employer concluded

---

**7.** *Compare with Pennsylvania State Troopers Association*, 39 A.3d at 623.

**8.** *Compare with Pennsylvania State Troopers Association*, 39 A.3d at 623.

that the pro-union employee was intoxicated based upon statements from two other employees who said that they did *not* observe the pro-union employee display any of the classic signs of intoxication. *Id.* at 717. This Court then focused on disparate treatment, noting that it can be a valid way of demonstrating an improper motive "provided the circumstances of the employees who are compared with the complainant are sufficiently similar," and we found sufficient evidence of pretext where the record demonstrated that "other employees received lesser penalties for allegedly being intoxicated on the job." *Id.* at 719. In response to the employer's argument that it should be afforded leeway when deciding the appropriate discipline, this Court stated that the employer "certainly is permitted flexibility; what it may not do is base its decisions to grant leniency to some employees while being harsh with others upon union activity." *Id.* at 720. Ultimately, we held in *City of Reading* that the evidence of disparate treatment was evidence of pretext, and, combined with the employer's previous anti-union statements to the employee, sufficed to support an inference of anti-union animus.

In *Lehighton Area School District,* the employer asserted that it discharged the custodian employee because he collected overtime pay for conducting security checks on a building after the employer sold it. However, the record established that although the employee knew that the building had been sold, he was previously instructed by his superiors to check the building until he was told to stop, and the superiors never informed the employee to stop checking the building after it was sold. While conducting checks on the already sold building, the employee filed a labor grievance; the employer then ordered him to stop filing grievances and began an investigation into the employee's

time-sheets. On this record, we concluded that there was substantial evidence of pretext because an inference could be drawn that the employee's union activities caused the employer to "seize upon" and/or "overreact" to the employee's building checks. 682 A.2d at 443. In addition, we noted that the employer's disciplinary policy provided progressive penalties including, where appropriate, an oral warning, a written warning, suspension, or dismissal. We found substantial evidence of pretext existed where the employee had never been disciplined and the employer did not consider a lesser penalty, even though the employee, as a matter of fact, engaged in innocuous behavior because he was never instructed to stop checking the building. Given these two instances of pretext, together with the timing of the discharge, which by itself was a "strong indicator" of anti-union animus, *id.,* this Court concluded in *Lehighton Area School District* that an inference of anti-union animus was supported by substantial evidence.

By way of contrast, in *Pennsylvania State Troopers Association,* the employer maintained that it issued disciplinary action reports against two pro-union police officers because they misrepresented that they had received complaints about a captain, and the two officers conducted an unauthorized investigation of the captain. After the officers completed their investigation, the matter was assigned to internal affairs to investigate the allegations against the captain, and the internal affairs investigation resulted in dismissing the complaint against the captain. The union argued that two police officers were reprimanded due to anti-union animus because the internal affairs investigation was not thorough; the lead investigator reported to the captain; and contrary to standard practice, the captain was interviewed first as opposed to last. This Court disagreed,

concluding that this so-called evidence of pretext was insubstantial and proved only suspicion and conjecture. In doing so, we held that the order in which witnesses of an investigation are interviewed was a matter of discretion, and we determined that although the "[u]nion may have conducted the [captain's] investigation differently [this] does not constitute substantial proof of anti-union bias." *Id.* at 623. Further, we rejected the union's claim that the officers were subjected to disparate treatment because the person to whom they were compared did not engage in "similar" misconduct. *Id.* For these reasons, this Court concluded in *Pennsylvania State Troopers Association* that the evidence was legally inadequate to sustain an inference of anti-union animus.

 Here, the PLRB provides a number of reasons to support its determination that the County's decision to discharge Medina and Epps for taking snacks from Sepulveda's mailbox was pretextual. However, when these reasons are considered in light of our case law recited above, it becomes evident that the evidence relied upon by the PLRB does not possess the qualities and characteristics necessary to constitute affirmative, substantial evidence of pretext.

Initially, the PLRB finds pretext in the fact that this was the first time the County terminated an employee for taking something from a co-worker's mailbox. (PLRB's Final Order at 5.) Contrary to the PLRB's conclusion, this fact lacks any pretextual value because there is no evidence that any other employee was caught taking something from a fellow employee's mailbox. *See Asarco v. National Labor Relations Board,* 86 F.3d 1401, 1410 (5th Cir.1996) (concluding that an employee "is not insulated from discharge simply because he is the first employee" to commit a certain type of misconduct). Instead,

Fredericks did not investigate the allegations he received from employees concerning personal items, including a cell phone, being taken from mailboxes because no written complaints were filed by the employees or the employees never provided their supervisors with a specific timeframe in which the items were stolen. (F.F. Nos. 11, 29, 35–37; N.T. at 34–37.) Consistent with this policy, Christina Delgado and Arnold reviewed surveillance video for the then two most recent two days on which Sepulveda said that items had been taken from her mailbox. (F.F. Nos. 12–13.)

The PLRB nonetheless faults the County for not reviewing surveillance videotape for extended periods of time when investigating Sepulveda's complaint, and also for not taking the initiative to review surveillance with respect to alleged instances of theft absent an employee complaint and time-frame. (PLRB's Final Order at 5–6.) However, we conclude that the PLRB erred in determining that the County's inaction reflects affirmative evidence of disparate treatment or some other form of pretext. Indeed, to the extent that the PLRB implies impropriety on the part of the County, its underlying rationale is based on the presupposition that the County investigated Sepulveda's complaint solely because it knew beforehand that Medina and Epps took the snacks and were "out to get them" because they were supporters of the Union. Such an inference has no support in the record and is unsustainable. Like the internal affairs unit in *Pennsylvania State Troopers Association,* the County has discretion to determine which cases it will investigate, so long as it does so uniformly, and there is nothing unreasonable or indicative of pretext in the fact that the County requires the filing of a written report or an ascertainable time-frame before investigating allegations of theft.

Moreover, whereas the PLRB noted that Sepulveda stated in her second incident report that it was not "a big deal" that Medina took snacks from her mailbox; Christina Delgado did not know for sure if Medina and Epps could be disciplined; the County did not adequately consider Buckwalter's statement regarding Medina's permission to take snacks *after* Fredericks terminated Medina; and the County did not impose a lesser form of discipline on Medina and Epps, (PLRB's Final Order at 6), there is no evidence that Sepulveda or Christina Delgado were vested with decision-making authority as to discipline, or that they had experience in enforcing the County's disciplinary policy, and any assessment on their part of Medina's and Epps' behavior and/or appropriate discipline is irrelevant. Further, Sepulveda stated in a conversation with Fredericks and in her initial report that she only gave permission to persons other than Medina or Epps to take items from her mailbox, and she insisted in her second incident report that Medina should have first asked for permission before taking snacks from her mailbox. (F.F. Nos. 15, 20; Union Ex. U–6.) Finally, Medina admitted that he took snacks from Sepulveda's mailbox and had ample opportunity to assert his innocence and present evidence through the grievance process and at hearings. In so doing, Medina argued that he had received permission from Sepulveda the previous year, brought it to the committee's attention that Buckwalter overheard a conversation that he had with Sepulveda, and asked Sepulveda to testify on his behalf, which she declined to do. (County Ex. C–3–C–7; N.T. at 83, 245–47.)

Considering the record as a whole, the evidence does not demonstrate that Medina and Epps were subjected to disparate treatment or that the County deviated from past practices in deciding to terminate their employment. Indeed, there is no evidence that other employees engaged in similar conduct and received a lesser sanction. To the contrary, Fredericks disciplined all three employees uniformly for their infractions with respect to Sepulveda's mailbox, including Boddy, and there is no evidence that she was engaged in union activities. As in *Pennsylvania State Troopers Association,* the fact that the PLRB would have conducted the investigation differently or believed Medina's and Epps' stories over Sepulveda's statements do not constitute substantial proof of pretext. Therefore, we conclude that there is no substantial evidence of record to support a finding of pretext that is reasonably reflective of an anti-union motive on the County's part.

 The only remaining factor relied upon by the PLRB to support a finding of anti-union animus was the timing between Medina's and Epps' union activities and County's decision to discharge them. However, as a general matter, "timing alone is not sufficient to raise an inference of anti-union animus." *Pennsylvania State Park Officers Association v. Pennsylvania Labor Relations Board,* 854 A.2d 674, 688 (Pa.Cmwlth.2004). While timing may be a compelling factor, for example, in situations where an employer previously acquiesced in the employee's misconduct and then decided to discipline the employee for the same misconduct shortly after the employee engaged in union activities, *see Lehighton Area School District,* 682 A.2d at 442–43, if the circumstances show that the employee's misconduct and discipline is merely coincidental with his union involvement, then evidence of timing is a weak factor as a matter of law, *see Shive,* 317 A.2d at 314 (failing to "understand the importance of the timing of the termination" where the teacher applied for a job with the school district and was temporarily hired; the teacher later

engaged in pro-union activity; and the school board subsequently decided not to hire her on a full-time basis at a regularly scheduled meeting due to poor credential ratings). *See also National Labor Relations Board v. O.A. Fuller Super Markets, Inc.,* 374 F.2d 197, 200 (5th Cir.1967) ("If the specific employee happens to be both inefficient and engaged in union activities, that coincidence standing alone is insufficient to destroy the just cause for his discharge.").

Here, the timing of Medina's and Epps' terminations falls into the latter category. Without strong evidence of pretext (or some other form of anti-union animus), the timing of the terminations is essentially irrelevant because after Medina and Epps informed their supervisors of their support for the Union, they committed punishable misconduct in the workplace. Indeed, if the timing of the County's discipline in this case were a strong indicator of anti-union animus, then employers would be prohibited from disciplining their employees for legitimate reasons just because the employee engaged in pro-union conduct prior to committing work-related infractions. In this vein, it was imperative that the Union, as the party asserting the unfair labor charge, adduce evidence clearly indicative of anti-union motivation in addition to timing in order to create a sustainable inference of anti-union animus. As explained above, no such evidence was presented in this case. Therefore, we conclude that the Union failed to submit sufficient evidence to support an inference of anti-union animus and that the PLRB erred as a matter of law in concluding to the contrary.[9]

Accordingly, we reverse the PLRB's final order concluding that the County violated section 1201(a)(3) of PERA.[10] Because the PLRB's conclusion that the County violated section 1201(a)(1) was completely predicated on the section 1201(a)(3) violation, we likewise reverse the PLRB's decision upholding the section 1201(a)(1) violation.[11]

### ORDER

AND NOW, this 30th day of December, 2013, the May 15, 2012 final order of the Pennsylvania Labor Relations Board is reversed.

### DISSENTING OPINION BY Judge McGINLEY.

I respectfully dissent to the Majority's conclusion that the PLRB erred when it determined that the Union met its burden of proving that the County knew of the union activities of Tommy Epps (Epps) and Adam Medina (Medina) and dismissed them because of anti-union animus.

9. In concluding that anti-union animus was established in this case, the dissent merely restates the reasons set forth in the PLRB's decision. (Dissenting op. at 1119–20.) Because our analysis fully discusses and discounts the PLRB's purported justifications for finding anti-union animus, we need not separately address the arguments advanced by the dissent.

10. The County also argues that many of the hearing examiner's findings of fact are not supported by substantial evidence and that the PLRB's decision was arbitrary and capricious. Due to our disposition, we need not address these issues.

11. PLRB's Final Order at 6 n.6 (concluding that the section 1201(a)(3) violation was "a derivative violation" of section 1201(a)(1) and declining to address the 1201(a)(1) violation in and of itself); *Metropolitan Edison Co. v. National Labor Relations Board,* 460 U.S. 693, 698 n. 4, 103 S.Ct. 1467, 75 L.Ed.2d 387 (1983) ("Although §§ 8(a)(1) and (a)(3) are not coterminous, a violation of § 8(a)(3) constitutes a derivative violation of § 8(a)(1). Because the Board has not suggested that there is an independent violation of § 8(a)(1), we consider only the § 8(a)(3) charge.").

The Majority concludes that the PLRB committed an error of law because the PLRB imputed the knowledge of Fred Arnold (Arnold) and William Delgado (the supervisors of Medina and Epps) to Drew Fredericks (Fredericks), the director of the County's Youth Intervention Center and the individual who made the decision to terminate Medina and Epps. The Majority asserts that the party who alleges the unfair labor practice has the burden to establish that the employer's decision maker had knowledge of the employee's protected activity. Here, the Majority asserts that the record is devoid of any evidence of a conversation between Arnold and Fredericks or William Delgado and Fredericks that conveyed the information that Medina and Epps were involved in union activities.

I believe that Epps and Medina met their burden and that the knowledge of their union activity may be imputed to the County. The PLRB found as fact that "Medina spoke with his supervisor, Fred Arnold, about his support for the Union in May 2010, sharing with him what he thought about the Union and what he was doing with respect to the Union's efforts." Proposed Decision and Order, December 19, 2011, (Decision), Finding of Fact No. 39 at 5. The PLRB also found as fact that Epps "talked with his supervisor, William Delgado, about the Union, stating that the Union was coming. He told William Delgado that he had talked with Union representatives." Decision, Finding of Fact No. 40 at 5. Arnold and Christina Delgado, the wife of William Delgado, and also a supervisor, were actively involved in the investigation of Epps and Medina. Arnold assisted Christina Delgado in the review of videotapes and in the decision to refer the matter to Fredericks. William Delgado assisted Fredericks in contacting Evette Sepulveda (Sepulveda) to prepare an unusual incident report. William Delgado also contacted Leroy Kirkland (Kirkland) to prepare an unusual incident report in which Kirkland stated that he did not give Epps permission to remove items from his mailbox. Arnold and William Delgado were aware of Epps's and Medina's protected activities and were actively involved in the investigation of them.

The Majority correctly asserts that no binding Pennsylvania decision has ever addressed the issue of whether a supervisor's knowledge that an employee is engaged in pro-union activity may be automatically imputed to the employer. I cannot agree with the Majority's conclusion that a union must prove that one supervisor with knowledge of an employee's union activity told a higher level supervisor of the activity in order to establish that the employer was aware of the employee's union activities. The PLRB did not err when it imputed the knowledge of Arnold and William Delgado concerning the union activities of Epps and Medina to the County. *See Pennsylvania Labor Relations Board v. Cadman,* 370 Pa. 1, 87 A.2d 643 (1952).

I also disagree with the Majority's conclusion that the record does not support a finding that Fredericks's decision to terminate the employment of Epps and Medina was motivated by anti-union animus. First, the timing of the terminations supports the finding. Epps and Medina informed their supervisors of their support for the Union in the spring of 2010. The Union filed its petition for certification on June 10, 2010. Epps and Medina took the items on June 16 and 17, 2010. Sepulveda complained to her supervisor about items missing from her mailbox on June 21, 2010. Epps and Medina were discharged on June 23, 2010. While timing may be a coincidence and not indicative of anti-union animus, *see Shive v. Bellefonte Area Board of Directors,* 12 Pa.Cmwlth. 543, 317 A.2d 311 (1974), the timing of a discharge may provide a strong

indicator that the discharge was motivated by anti-union animus. *Lehighton Area School District v. Pennsylvania Labor Relations Board,* 682 A.2d 439 (Pa.Cmwlth. 1996).

The PLRB found other indicators to support the determination that the discharges of Epps and Medina were pretextual. Anti-union animus is rarely overt. As a result, an unlawful discriminatory reason or motive for discharge is often based on inferences deduced from the totality of the circumstances. *Pennsylvania Labor Relations Board v. Stairways, Inc.,* 56 Pa.Cmwlth. 462, 425 A.2d 1172 (1981).

The PLRB concluded that irregularities existed in the investigations. For instance, despite Sepulveda's claim that items went missing from her mailbox for weeks or months, the County only looked at two days of videotape. The County did not take into account Sepulveda's incident report where she stated that she did not care if Medina took snack items from her mailbox. The PLRB also noted that the County did not investigate other reports of theft including that of a cellular telephone. If theft of snacks warranted the dismissal of two employees, it would follow that the theft of something more valuable, like the telephone, would merit an investigation. Further, as part of the investigation, the County ignored Medina's claim which was supported by an email from a coworker that he had permission from Sepulveda. Similarly, the County never made a further inquiry of Epps when he stated that he believed Kirkland permitted him to take snacks from Kirkland's mailbox. Also, the County moved to terminate Epps and Medina without following the steps of the progressive disciplinary policy.

Again, to illustrate the disparate treatment, when the County became aware that another employee was allegedly taking food from the employees' refrigerator, Fredericks admitted that there was no investigation because no one wanted to write a report. If theft of small snack items warranted dismissal, why did the County ignore the possible theft in that case especially when the alleged perpetrator's identity was known? I believe that that PLRB did not err when it determined that the discharges of Medina and Epps were motivated by anti-union animus on the part of the County.

Accordingly, I would affirm the order of the PLRB.